# In The Matter Of:

*American Family Insurance, et al. v.*
*McLaren Automotive, et al.*

---

*Brandon Saszi*
*February 27, 2023*
*Video Deposition*

---

*Regency-Brentano, Inc.*
*13 Corporate Square*
*Suite 140*
*Atlanta, Georgia 30329*
*404.321.3333*



**REGENCY-BRENTANO, INC.**
*Certified Court Reporters*

Min-U-Script® with Word Index

**Video Deposition**

```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF GEORGIA
2                        ATLANTA DIVISION

3

4

5    AMERICAN FAMILY HOME
     INSURANCE COMPANY, as
6    Subrogee of Adrian Biesecker,

7         Plaintiff,
                                      CIVIL NO.:
8    vs.                              1:22-CV-01392-LMM

9    MCLAREN AUTOMOTIVE, INC.,
     and KRAUSE FAMILY MOTORCARS, LLC,
10
          Defendants.
11
     ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
12               VIDEOTAPED DEPOSITION OF
                      BRANDON SASZI
13

14                  February 27, 2023
                       2:27 p.m.
15

16            Miller Insurance Law Enterprise
               115 Perimeter Center Place
17              South Terraces, Suite 430
                    Atlanta, Georgia
18

19           Michelle R. Lowe, RPR, CCR-2748

20

21               REGENCY-BRENTANO, INC.
               CERTIFIED COURT REPORTERS
22               13 Corporate Square
                      Suite 140
23              Atlanta, Georgia 30329
                     404-321-3333
24

25
```

**Regency-Brentano, Inc.**

```
1    APPEARANCE OF COUNSEL:

2    On behalf of the Plaintiff:

3              MARIE CHEUNG-TRUSLOW

4              Attorney at Law

5              LAW OFFICES OF MARIE CHEUNG-TRUSLOW

6              101 Arch Street, 8th Floor

7              Boston, Massachusetts  02110

8              617-539-8674

9              marie@cheungtruslowlaw.com

10

11   On behalf of the Defendant, McLaren Automotive,

12   Inc.:

13             RYAN E. COSGROVE

14             Attorney at Law

15             NELSON MULLINS

16             Pacific Gateway, Suite 900

17             19191 South Vermont Avenue

18             Torrance, California  90502

19             424-221-7404

20             ryan.cosgrove@nelsonmullins.com

21

22

23

24

25
```

**Video Deposition** 3

```
1   CONTINUED APPEARANCE OF COUNSEL:

2   On behalf of the Defendant, Krause Family Motorcars,

3   LLC:

4           ADAM KLEIN

5           Attorney at Law

6           FAIN MAJOR & BRENNAN PC

7           5605 Glenridge Drive

8           Suite 900

9           Atlanta, Georgia 30342

10          404-688-6633

11          aklein@fainmajor.com

12

13  Also Present:

14          Henry Stewart, Videographer
            Atlanta Legal Media
15

16

17

18

19

20

21

22

23

24

25
```

Video Deposition                                      4

```
1   INDEX TO EXAMINATIONS                          PAGE

2   Examination by Ms. Cheung-Truslow:             6

3   Examination by Ms. Cosgrove:                   79

4   Further Examination by Ms. Cheung-Truslow:     84

5   Examination by Mr. Klein:                      85

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Video Deposition                                  5

```
 1              INDEX OF EXHIBITS
 2   For the Plaintiff:
 3   EXHIBIT   DESCRIPTION                    PAGE
 4     P-1     McLaren Dealer Sales and Service    18
 5             Agreement
 6     P-2     McLaren Super Series Service and    48
 7             Warranty Guide
 8     P-3     March 24, 2021, 765LT e-mail chain
 9     P-16    Defendant Krause Family MotorCars'  48
10             Responses to Plaintiff's
11             Interrogatories
12     P-17    Answer and Additional Defenses of   61
13             Defendant Krause Family MotorCars, LLC
14     P-18    Vehicle Fire Investigation          79
15             Preliminary Report
16
17
18
19
20
21
22
23
24
25
```

```
 1          THE VIDEOGRAPHER:  Today's date is
 2  February 27th, 2023.  The time is 2:27 p.m.  We're
 3  on the record.
 4          Will the court reporter please swear in
 5  the witness.
 6                  BRANDON SASZI,
 7  being first duly sworn or affirmed to testify to the
 8  truth, the whole truth, and nothing but the truth,
 9  was examined and testified as follows:
10      EXAMINATION BY COUNSEL FOR THE PLAINTIFF
11  BY MS. CHEUNG-TRUSLOW:
12      Q    Good afternoon.
13           My name is Marie Cheung-Truslow.
14           And can you state your name for the
15  record, please.
16      A    Brandon Saszi.
17      Q    Can you spell your last name.
18      A    S-A-S-Z-I.
19      Q    Do you have a middle initial?
20      A    C.
21      Q    What does it stand for?
22      A    Carter.
23      Q    May I call you Brandon?
24      A    You may.
25      Q    Brandon, I'm going to be asking you some
```

1   questions today, not much.  To the extent that you

2   don't understand my question, please just stop me

3   and say, Marie, I don't understand your question.

4   Because I'll be happy to rephrase my question.  All

5   right?

6        A    Okay.

7        Q    And make sure that all of your answers are

8   audible so that the court reporter can take down

9   what you are saying.  All right?

10       A    Yes, ma'am.

11       Q    Okay.  And if you need to take a break,

12  just let me know.  I'll be more than happy to

13  accommodate your request for a break.  But just make

14  sure you answer any pending questions before you ask

15  for that break.  All right?

16       A    Yes, ma'am.

17       Q    Okay.  Brandon, what did you do to prepare

18  for today's deposition?

19       A    Nothing.  I -- I talked to our tech be --

20  he talked to me before I left and that was it.

21       Q    Okay.  And when you say before you left,

22  for today?

23       A    Yes.

24       Q    Okay.  What -- and which tech did you

25  speak with?

1          A       Derick Lee.

2          Q       And what did you talk about?

3          A       He just said he was here today and some of

4     the questions were based around some of the more

5     technical parts of the -- of the case, and that was

6     about it.

7          Q       Okay.  Did he give you any suggestions,

8     recommendations, advice about your deposition?

9          A       No, ma'am.

10         Q       All right.  And did you talk about

11    specifics as to the -- what the questions -- which

12    questions were asked?

13         A       Nothing specific, no.

14         Q       Okay.  And what is your role at MotorCars

15    of Atlanta?

16         A       I am the general manager.

17         Q       And what are your primary responsibilities

18    as the GM?

19         A       Just overseeing the general day-to-day

20    operations, relationships with manufacturers,

21    shareholders, things like that.

22         Q       All right.  And so do you understand the

23    structure of MotorCars of Atlanta?

24         A       Yes.

25         Q       All right.  What is the corporate

1    structure of MotorCars of Atlanta?

2        A    There's two owners:  Me and one other

3    gentleman.  What -- do you want me to go through the

4    whole employment?

5        Q    Just the organizational chart.

6        A    Yeah.  We have two owners:  Me and one

7    other gentleman.  We have two sales managers, a

8    service and parts director, a parts manager, F&I

9    manager, salespeople, porters, technicians.

10        Q    Okay.  And you said there's another owner?

11        A    Yes.

12        Q    Who is that?

13        A    Vernon Krause.

14        Q    All right.  And how about Brian Kemp?

15        A    Brian Kemp?

16        Q    Does that ring a bell?

17        A    The governor?  No.

18        Q    No.

19        A    I don't -- I don't know.  I don't know

20    anybody.

21        Q    Okay.  You don't know him to be a manager?

22        A    Brian Kemp?  No, ma'am.

23        Q    Okay.  So you and Vernon Krause are

24    owners of --

25        A    Yes.

```
 1        Q    -- MotorCars of Atlanta?

 2        A    Yes.

 3        Q    Does MotorCars of Atlanta -- is that a

 4   d/b/a for Krause Family MotorCars --

 5        A    It is.

 6        Q    -- LLC?

 7        A    It is.

 8        Q    All right.  Just make sure that I finish

 9   my question before you answer.

10        A    Understood.

11        Q    So MotorCars of Atlanta is a d/b/a?

12        A    Yes.

13        Q    Does the Krause Family MotorCars also have

14   any other d/b/as?

15        A    No.

16        Q    How about the --

17        A    Well --

18        Q    -- McLarens of --

19        A    Yeah.

20        Q    -- Atlanta?  How about --

21        A    Yes.  Sorry.  Yes, it does.

22        Q    And what are they?

23        A    Lamborghini Atlanta, McLaren Atlanta,

24   Lotus of Atlanta, Koenigsegg Atlanta, Rolls-Royce

25   MotorCars Atlanta, and -- did I say McLaren Atlanta?
```

**Regency-Brentano, Inc.**

1  I don't remember -- those -- those are all of them.

2      Q    All right.  And are -- is Krause Family

3  MotorCars organized under the laws of Georgia?

4      A    Yes.

5      Q    Any other state?

6      A    No, ma'am.

7      Q    What is the business location of Krause

8  Family MotorCars?

9      A    7865 Roswell Road, Sandy Springs.

10      Q    And is there any association with Krause

11  Family MotorCars related to this address, 1575

12  Mansell Road, Alpharetta, Georgia?

13      A    That is another dealership that my partner

14  owns.

15      Q    Okay.  So that would be Vernon Krause?

16      A    Yes.

17      Q    So which dealership is that?

18      A    Angela Krause Ford Lincoln.

19      Q    What is that?

20      A    Angela Krause Ford Lincoln.

21      Q    Angela Krause.  Okay.

22      A    Yes.

23      Q    And is Angela Krause -- who is Angela?

24      A    That was his daughter that passed away.

25  He named it after her.

1        Q    All right.  And is that dealership also --

2   does it -- are they authorized dealers for McLaren?

3        A    No, ma'am.

4        Q    Okay.  Which -- which manufacturer are

5   they dealers for?

6        A    Ford and Lincoln.

7        Q    Does Krause Family MotorCars own any other

8   dealerships?

9        A    No, ma'am.

10       Q    Just those two primary ones?

11       A    That one is not under the Krause Family

12  MotorCars.  It's a different --

13       Q    Okay.

14       A    -- LLC.

15       Q    Okay.  All right.  So Grause Family --

16  Krause Family MotorCars, LLC only owns the one

17  dealership?

18       A    Yes, ma'am.

19       Q    Okay.  And what is the business of

20  MotorCars of Atlanta?

21       A    Automobile sales and service.

22       Q    What kind of automobiles?

23       A    Lamborghini, Aston Martin, Lotus, McLaren,

24  Rolls-Royce, and Koenigsegg.

25       Q    In addition to the vehicles as part of the

1    inventory they own, are there any other assets that

2    Krause Family MotorCars own?

3        A    No.

4        Q    What about the buildings it houses its

5    inventory?

6        A    Yes.

7        Q    So it -- it owns the --

8        A    It --

9        Q    -- building?

10       A    No.  It rents -- it leases the building

11   from another company.

12       Q    Okay.  In addition to the inventories are

13   there any other assets that Krause Family MotorCars

14   own?

15       A    No.

16       Q    Can you tell me who at MotorCars of

17   Atlanta had any dealings whatsoever with the vehicle

18   repair to the McLaren 764 [sic] which is the subject

19   vehicle of our litigations?  So I can name you some

20   and I just want to make sure I'm complete.  So

21   there's Derick Lee, Isaac Robles.  Who else?

22       A    Max Landes.

23       Q    Okay.

24       A    And -- sorry.  I didn't -- I didn't catch

25   the first -- I heard it, but I didn't comprehend the

1  first part of the question.

2      Q    The employees who were involved in the

3  servicing of the McLaren 765 which is the subject

4  vehicle of this litigation.

5      A    It would be those three.

6      Q    Okay.

7      A    It -- I -- Derick was the only one who

8  actually touched the car.  But --

9      Q    Right.

10      A    -- the service director and the service

11  advisor would have had a part in the car being in

12  the shop.

13      Q    Did you personally observe any damage to

14  the McLaren vehicle resulting from rat stuff?

15      A    Rodent, yes, I did.

16      Q    Rodent damage.

17      A    I did, yes.

18      Q    You did.  Okay.

19          Did you take any photographs?

20      A    No, ma'am.

21      Q    Do you know who took photographs of it?

22      A    I would assume just the tech, but I don't

23  know exact -- if anybody else may have.

24      Q    Did you see those photographs?

25      A    I did.

**Brandon Saszi - February 27, 2023**                    **15**
**Video Deposition**

1       Q    Okay.  Can you take a look at Exhibit

2    Number -- I just want to make sure these are the

3    same photographs -- 11, please.

4       A    Is it in here?

5       Q    It's in that stack, yes.

6       A    Sorry.  These are not exactly in numerical

7    order.

8            Oh, there we go, yes.

9       Q    Exhibit 11 -- there should be several

10   photographs there.

11      A    Okay.

12      Q    And the question is:  Are those the

13   photographs you saw?

14      A    I don't recall exactly.

15      Q    Okay.  But at some point in time somebody

16   showed you the photographs?

17      A    I've seen photographs of the car.  I can't

18   tell you which ones were -- which exact ones I saw.

19      Q    Okay.  And did you personally observe

20   damage to the vehicle from the -- from the rat?

21      A    Yes, when it was on the lift.

22      Q    Okay.  What did you observe?

23      A    Just chewed-through wires and there was a

24   lot of chewed foam in it, things like that.

25      Q    Did you actually see chewed-through wires

Brandon Saszi - February 27, 2023          16
Video Deposition

1   of the wiring harness?

2       A    I saw chewed-through wires.  I don't know

3   exactly which part they were on.

4       Q    Okay.  And did you see -- did you actually

5   see chew damage from a rat on the fuel line?

6       A    Not that I know of.

7       Q    Okay.  Do you have any specialized

8   training or certification in automotive mechanics?

9       A    No.

10      Q    Do you know what the relationship, if

11  there is any, between MotorCars of Jackson and

12  MotorCars of Atlanta?

13      A    It was just a business service

14  relationship.

15      Q    Is there any formal business service

16  relationship between the two companies?

17      A    Just that we've fixed a car that came in.

18      Q    Okay.  And how -- do you know how you were

19  chosen to fix the car for MotorCars of Jackson?

20      A    I don't.

21      Q    Is there any written agreement or contract

22  between MotorCars of Jackson and MotorCars of

23  Atlanta?

24      A    The repair order.  Whatever is on the

25  repair order.

Brandon Saszi - February 27, 2023          17
Video Deposition

1        Q    Okay.  But nothing aside from that?

2        A    No.

3        Q    Have you done work for MotorCars of

4   Jackson before?

5        A    I don't know.

6        Q    And who would have that kind of

7   information?

8        A    Max.  I could get it.  I mean, I can look

9   through our system, but I don't know -- you know, I

10  don't know every car that comes through and how many

11  times.

12       Q    Okay.  And your primary responsibility

13  again as GM is the oversight of all of the

14  different -- different departments?

15       A    Yes.

16       Q    Okay.  But you don't get into the detailed

17  nitty-gritty of each of the department functions?

18       A    Not into every single car that's in the

19  shop and how many times they've been in the shop,

20  no.

21       Q    Okay.  And are you responsible for

22  financials of the MotorCars of Atlanta?

23       A    Yes.

24       Q    All right.  I'm going to show you Exhibit

25  Number 1, if you could get to that.

Brandon Saszi - February 27, 2023          18
Video Deposition

```
 1              (Krause Deposition Exhibit P-1 was marked
 2    for identification and attached to the transcript.)
 3    BY MS. CHEUNG-TRUSLOW:
 4        Q    I'm going to represent to you Exhibit 1
 5    are just select pages of the McLaren Automotive,
 6    Incorporated and the Krause Family MotorCars McLaren
 7    Dealer Sales and Service Agreement.
 8        A    Okay.  I'll find that.
 9             Okay.
10        Q    Have you seen these select pages before?
11        A    These select pages?
12        Q    Yeah.  I didn't print out, like, 300 pages
13    of it.  These are just select pages from the --
14        A    I have seen the dealer agreement, yes.
15        Q    Okay.  Do you know whether this is the
16    most current dealer agreement?
17        A    Yes.
18        Q    And how do you know that?
19        A    Because we haven't gotten another one to
20    sign.  They tell us if --
21        Q    Very good.
22             All right.  Well, what is the -- what is
23    the nature of this agreement?
24        A    Just --
25             MR. COSGROVE:  Hold on.
```

```
 1              Object to form.  Overbroad.
 2              MR. KLEIN:  You can answer.
 3              MR. COSGROVE:  Go ahead.
 4              THE WITNESS:  Okay.
 5       A    Just to lay out the agreement -- the
 6  dealer-manufacturer relationship.
 7  BY MS. CHEUNG-TRUSLOW:
 8       Q    Okay.  And what is your general
 9  understanding is the dealer-manufacturer
10  relationship?
11       A    We sell and service the cars that they
12  manufacture.
13       Q    Okay.  And you get compensated for that?
14       A    Yes.
15       Q    All right.  So let's talk about the -- on
16  Page 2 of this Exhibit Number 1.  It's highlighted.
17  I'm not sure whether it's highlighted on yours.
18  It's kind of shaded.
19       A    Yeah, it's shaded.
20       Q    All right.  It says:  Krause Family
21  MotorCars, LLC.
22              Is that the same thing as MotorCars of
23  Atlanta?
24       A    It's the parent company, yes.
25       Q    Okay.  When you say parent company, what
```

1   does that mean?

2       A    It means it's an LLC that owns MotorCars

3   of Atlanta.

4       Q    Isn't MotorCars of Atlanta simply the

5   d/b/a?

6       A    Yes.

7       Q    So it's not a legal corporation?

8       A    No, ma'am.

9       Q    Is that correct?

10      A    Correct.

11      Q    Okay.  All right.  Let's go to -- the next

12  shaded area is Section B, and it says:  McLaren

13  operating standards.

14           Do you see that?

15      A    Uh-huh.

16      Q    What is that?

17      A    The operating standards are what they --

18  how they expect a dealer to service their customers,

19  their clients.

20      Q    Okay.  And is -- is that an online form or

21  is there a specific paper?

22      A    It's located in the dealer agreement.

23           MS. CHEUNG-TRUSLOW:  Okay.  When you get a

24  chance, Ryan, can you produce that to us.  It -- it

25  wasn't produced to us.

```
 1              And if you have the McLaren operating
 2    standards, that wasn't produced to us.  So if you
 3    could produce that to us, Adam.
 4              MR. KLEIN:  Okay.
 5    BY MS. CHEUNG-TRUSLOW:
 6        Q     All right.  C, it says:  To be appointed
 7    as authorized dealer.
 8              Do you see that?
 9        A     Yes, ma'am.
10        Q     And the appointment to be authorized
11    dealer includes the maintenance and repair services?
12        A     Yes, ma'am.
13        Q     For the McLaren vehicles?
14        A     Yes, ma'am.
15        Q     Okay.  What does that mean, when you're an
16    authorized deal -- authorized person to do --
17    company to do maintenance and repair?
18        A     It means we are authorized to do warranty
19    repairs for any of the cars that they sell and --
20    that they sell.
21        Q     Okay.  And what happens if you do the work
22    and there's issues with the work --
23              MR. COSGROVE:  Object to form.  Vague --
24    BY MS. CHEUNG-TRUSLOW:
25        Q     -- and --
```

```
 1              MR. COSGROVE:  -- and ambiguous.

 2              I'm sorry.

 3              MS. CHEUNG-TRUSLOW:  I'm sorry.

 4              MR. COSGROVE:  I thought you were done.

 5              MS. CHEUNG-TRUSLOW:  I'm sorry.

 6              You're jumping the gun too.

 7   BY MS. CHEUNG-TRUSLOW:

 8       Q    What happens -- what happens when

 9   McLaren -- what happens when MotorCars of Atlanta

10   does some work but it does it in a way that does not

11   meet the standards, you know, that McLaren expects?

12              MR. COSGROVE:  Object to form.  Vague and

13   ambiguous.

14       A    I -- I don't know what --

15   BY MS. CHEUNG-TRUSLOW:

16       Q    Well, let me --

17       A    -- that means.

18       Q    Thank you.  That's okay if you don't.  And

19   perfectly understandable.  If you don't understand

20   it, please do ask me to rephrase it.

21              So, for example, if you -- if MotorCars of

22   Atlanta performs certain work and it's not according

23   to the instructions that McLaren says these are --

24   this is the meth -- methodology and these are the

25   supplies and equipment and the parts that need to be
```

1  done, you guys deviate from it, for whatever reason,

2  what happens to that kind of work and it causes some

3  type of, you know, damage to either the vehicle or

4  other property?

5          MR. COSGROVE:  Object to form.  Vague and

6  ambiguous.  Overbroad.

7      A    Well, the -- they don't -- they don't tell

8  us what necessarily to do on a vehicle all the time.

9  So it -- I don't --

10  BY MS. CHEUNG-TRUSLOW:

11      Q    I see.

12      A    I just don't really understand the --

13  because that's not really how it works so I don't --

14      Q    I see.

15      A    -- it's hard for me to understand how to

16  answer that question, because that's not how we fix

17  the cars.  We don't --

18      Q    Oh.

19      A    -- they don't say, hey, you have to do

20  this, and then we do it.  We -- we're -- had the

21  ability to make diagnostic things and fix them the

22  way that -- because we're there.

23      Q    I see.

24          So you have some independent judgment in

25  terms of how cars are going to be fixed?

```
 1        A     Yes.

 2        Q     But do you deviate from the SIS -- the

 3   McLaren SIS?

 4        A     I'm not familiar with that acronym.

 5        Q     Okay.  So you're not familiar with the --

 6   the computerized virtual tutorial of how to, for

 7   example, take down a tank?

 8        A     I'm not, no.

 9        Q     Okay.

10        A     I'm not technical --

11        Q     Okay.

12        A     -- on the technical side.

13        Q     That's okay.  Thank you.

14              Let's go on to Section D of -- of Page 2.

15   And it says:  McLaren products.

16              What McLaren products is being referred

17   here?

18        A     Can I take a second just to read --

19        Q     Yes --

20        A     -- through the --

21        Q     -- of course.

22              MR. COSGROVE:  I'm just going to object.

23   The document speaks for itself.  I'm sure the term

24   is in there.

25        A     In that sentence, I would think
```

Regency-Brentano, Inc.

```
 1  accessories, parts --
 2  BY MS. CHEUNG-TRUSLOW:
 3      Q    Okay.
 4      A    -- anything that they sell.
 5      Q    Okay.  And Section E also mentions
 6  policies and procedures.  Do you know what is the
 7  policies and procedures?
 8          MR. COSGROVE:  Same objection.  Document
 9  speaks for itself.
10      A    I don't know all of them but --
11  BY MS. CHEUNG-TRUSLOW:
12      Q    Typically, I mean, what are we talking
13  about here?  What policies and procedures?  For
14  what?
15          MR. COSGROVE:  Same objections.
16      A    Together with the schedules.
17          MR. COSGROVE:  I'll just assert an
18  additional objection that the terms are defined
19  later on; so it's speculative for the witness to say
20  anything other than what's in the document.
21      A    Yeah.  Unless I read through exactly what
22  they were saying, I don't --
23  BY MS. CHEUNG-TRUSLOW:
24      Q    You don't have an independent
25  understanding of policies and procedures?
```

**Brandon Saszi - February 27, 2023**          26
**Video Deposition**

1      A    I have -- I know what policies and

2  procedures are, but I don't know what McLaren --

3  exact policies and procedures are referring to here.

4      Q    Okay.  And when -- are you familiar with

5  this document?  Like, are you one of the -- did

6  you -- did you negotiate this document?

7      A    I would have been part of signing this.

8  It would have probably been signed by Vernon, but I

9  know of the document.  I mean, have I -- I don't

10 recall every page, word in it.

11     Q    Sure, of course.  It's a --

12     A    Because we've got --

13     Q    -- fairly large document.

14     A    -- we've got several of them, yeah.

15     Q    Yes.

16          But were you involved in the negotiation

17 which led to this agreement?

18     A    Yes.

19     Q    All right.  So maybe some terms you may

20 not be as familiar with, like policies and

21 procedures?

22     A    I do know what policies and procedures

23 are.  I don't know what they're exactly referring to

24 here.

25     Q    Okay.  Fair enough.

**Regency-Brentano, Inc.**

1             I mean, just generally what types of

2    policies and procedures are -- is being referred

3    here in Section E?

4             MR. COSGROVE:  Same objections.

5        A    I don't know which policy and procedure

6    it's being referred to here.

7    BY MS. CHEUNG-TRUSLOW:

8        Q    Okay.  All right.  Let's go on to the next

9    page.  It's also a gray line.  And it says:

10   Approved service representative means a person in

11   Georgia which has been appointed by McLaren to

12   provide maintenance and repair services in relation

13   to the vehicles and to distribute and sell spare

14   parts for the vehicles within McLaren's authorized

15   service representative network.

16            Is MotorCars of Atlanta an approved

17   service representative?

18       A    Yes.

19       Q    Okay.  All right.  Let's go on to the Page

20   4 of this document.  And it's got the grayed --

21   grayed.  It says:  Maintenance and repair services.

22            It says:  Means repair and maintenance

23   service -- services performed on the vehicles,

24   including warranty repair, servicing, vehicle,

25   recall works, and paint and body repairs.

1          Do you see that?

2     A    Yes.

3     Q    Is that the scope of the maintenance and

4   repair services that MotorCars of Atlanta performs

5   on McLaren vehicles?

6     A    We do not do paint and body repairs.

7     Q    Okay.  So that's not something that it's

8   not included in your -- well, in your company's

9   work?

10    A    Yes.

11    Q    All right.  So that's the only thing

12  that's not included is the paint and body repairs?

13    A    Yes.

14    Q    All right.  Next one, Page 5:  McLaren

15  vehicle warranty policy.

16         It says:  Means the warrant policy

17  produced by McLaren from time to time, applicable to

18  vehicles.

19         Do you see that?

20    A    Yes.

21    Q    Do you have a -- do you have the McLaren

22  vehicle warranty policy at -- in your place of

23  employment?

24    A    Yes.

25    Q    Okay.  And what is -- just generally what

1  is that?

2       A    It's a policy of how we get paid for

3  warranty work and what needs to be done and --

4       Q    Okay.  So --

5       A    -- how we submit the warranty claims and

6  things like that.

7       Q    So this is the McLaren vehicle warranty

8  policy between McLaren and MotorCars of Atlanta?

9       A    I can't speak to what they are trying to

10 say, but that's what I gather --

11      Q    Yes.

12      A    -- yes.

13      Q    And that's precisely what I'm trying to

14 ask you is what you understand, you know, these

15 clauses to mean.

16           All right.  So can you describe to me how

17 that process works.  So let's say there's a recall

18 on a McLaren vehicle.  How does it work?  So the

19 customer brings it in?

20      A    Uh-huh.

21      Q    You fix the -- correct the recall.  Then

22 what?

23           MR. COSGROVE:  Vague and --

24      A    After we --

25           MR. COSGROVE:  Hold on.

```
 1              Vague and ambiguous.  Overbroad.
 2       A    Yes.  That's the -- we fix the recall and
 3  generally -- if all work has been performed, we call
 4  the customer and tell them their car is done.
 5  BY MS. CHEUNG-TRUSLOW:
 6       Q    Okay.  So in terms of you said that it
 7  also -- the recall work that you -- well, not the
 8  recall -- the warranty work you perform on behalf of
 9  the McLaren -- who supplies the parts that needs to
10  be used for the recall?
11       A    Well, recall and warranty work are
12  different.
13       Q    Okay.
14       A    So that question is bringing in two
15  different things.
16       Q    Okay.  Let's just be more specific:  The
17  recall work.
18       A    The recall work --
19       Q    Yes.
20       A    -- the -- if there's parts included,
21  they're supplied by McLaren.
22       Q    And when do they supply those parts to
23  you?  Is it -- is it, like, in -- in bulk so that in
24  case somebody comes in or just one --
25       A    When we order them.
```

```
 1            MR. COSGROVE:  Object to form and
 2  overbroad.
 3  BY MS. CHEUNG-TRUSLOW:
 4       Q    So --
 5            MR. COSGROVE:  Incomplete hypothetical.
 6  BY MS. CHEUNG-TRUSLOW:
 7       Q    And how do you get advice about McLaren
 8  recalls?
 9       A    Bulletins from McLaren.
10       Q    All right.  And then who distributes the
11  recalls to the customers?
12       A    The manufacturer.
13       Q    In this case would be McLaren --
14       A    Yes.
15       Q    -- if there was one?
16            And so they bring the car in.  What do you
17  do with the recall work?
18       A    What do we do with it?
19       Q    Right.
20            MR. COSGROVE:  Incomplete hypothetical.
21  Vague and ambiguous.
22       A    Do you mean do --
23  BY MS. CHEUNG-TRUSLOW:
24       Q    Yeah.
25            What's the next step when some -- when a
```

Brandon Saszi - February 27, 2023                    32
Video Deposition

```
1   customer comes in and says, okay, this is subject to
2   this recall?
3              MR. COSGROVE:  Same objections.
4       A    We look at it, make sure the VIN applies.
5   And if it needs it, we -- if there's parts to be
6   ordered, we order the parts and fix the car.
7   BY MS. CHEUNG-TRUSLOW:
8       Q    Okay.  Who pays for the parts?
9       A    We pay for them initially.
10      Q    And then you get reimbursed by McLaren?
11      A    Yes.
12      Q    All right.  And who pays for your labor?
13      A    McLaren.
14      Q    And how do you charge the recall work to
15  McLaren?  In an invoice?
16      A    We have a warranty company that -- that
17  collects our warranty and recall claims with the
18  manufacturers.
19      Q    And what is the name of the warranty
20  company?
21      A    Automotive warranty services.
22      Q    All right.  And is that specific to
23  MotorCars of Atlanta?
24      A    Is that -- what --
25      Q    Yeah.  That company.  Is it part of
```

**Regency-Brentano, Inc.**

1  MotorCars of Atlanta?

2      A    No, ma'am.

3      Q    Okay.  And is it part of McLaren?

4      A    No, ma'am.

5      Q    So it's a third party?

6      A    Yes.

7      Q    What was it called again?

8      A    Automotive Warranty -- Automotive Warranty

9  Services, Inc.

10     Q    Okay.  So you pass -- are you saying that

11 you pass the paperwork for the warranty

12 reimbursement through Auto -- through that company?

13     A    They -- they have -- they're in our DMS

14 and they handle all of it.

15     Q    What's a DMS?

16     A    Dealer management software.  I'm sorry.

17     Q    All right.

18     A    Those acronyms.

19     Q    All right.  So they handle -- so you -- so

20 they handle all of the reimbursement for the recall

21 work that you do?

22     A    Yes.

23     Q    All right.  And so they're going to be

24 dealing directly with Mc -- McLaren?

25     A    Yes.  But, again, I'm talking about

1   recalls and you --

2        Q    I'm talking about recalls.

3        A    Oh, okay, because you -- you said warranty

4   a couple of times.  And I -- I -- I'm -- I don't

5   know if --

6        Q    Recalls.

7        A    -- we're flipping.  But, yeah, recalls,

8   yeah.

9        Q    Okay.  So even recalls you go through that

10  company?

11       A    Yes.

12       Q    Okay.  Because recalls are considered

13  warranty work?

14       A    No.

15       Q    No.

16       A    They're recalls.

17       Q    Okay.  All right.  So at some point -- so

18  you do the work, you charge McLaren for the parts

19  and labor?

20       A    Yes, yes, ma'am.

21       Q    But you initially have to buy the parts

22  for the recalls?

23       A    Yes, ma'am.

24       Q    All right.  Let's talk about warranty work

25  itself.  How does that work with McLaren?

1          MR. COSGROVE:  Object to form.  Vague and

2    ambiguous.  Overbroad.

3        A    How does it work?

4    BY MS. CHEUNG-TRUSLOW:

5        Q    Yeah.

6          You know, how do you get reimbursed?  You

7    know, do you have to submit some type of

8    notification that there's warranty work to be done?

9    Do you get approval?  You know, the entire gamut of

10   what steps are taken in order to effectuate warranty

11   work.

12         MR. COSGROVE:  Object to form.  Overbroad.

13       A    Yeah.  There's lots of different

14   circumstances with warranty work.

15   BY MS. CHEUNG-TRUSLOW:

16       Q    Okay.

17       A    On a general -- if a car is under warranty

18   and the car has -- it fits in all the warranty

19   policies between the customer and the -- and the

20   car, we fix the car and -- if it's ambiguous, we get

21   approval; and if it's not, then we fix the car and

22   submit for warranty claim.

23       Q    Okay.  And who do you submit it to?

24       A    McLaren.

25       Q    Not through the warranty servicing

1   company?

2          A    Yes.   They submit it on our behalf.

3          Q    Okay.

4          A    Sorry.

5          Q    All right.   Do you know whether there was

6   any parts of the service work that was performed by

7   Derick Lee that was considered warranty work?

8          A    There was none.   Again, we're -- no.

9   There was no warranty work done on that car.

10          Q    Okay.   And was there any recall work done

11   on that car?

12          A    Yes.

13          Q    And do you know whether that recall work

14   was -- did McLaren of Atlanta charge McLaren for

15   that work -- the recall work?

16          A    Yes.

17          Q    All right.   Let's go to the next pages.

18   Hold on.

19          A    Same exhibit?

20          Q    Same exhibit.

21          And it is actually -- it falls on page --

22   the eighth page of the exhibit.   Eighth page.

23          A    Okay.

24          Q    All right.   And it says appointment.

25          A    Okay.

1      Q    You're with me?

2      A    Yes, ma'am.

3      Q    All right.  Appointment.

4           It says:  With effect from the

5    commencement date, McLaren hereby appoints the

6    dealer as an authorized dealer and grants the dealer

7    the right to market, promote, distribute, and sell

8    the vehicles and the McLaren products and to provide

9    the maintenance and repair services at the

10   authorized location for the duration of this

11   agreement.

12          Do you know whether this agreement was in

13   force at the time that Derick Lee performed the work

14   on the McLaren?

15          MR. COSGROVE:  Object to form.  Vague and

16   ambiguous.

17     A    Do I know if it was enforced?

18   BY MS. CHEUNG-TRUSLOW:

19     Q    Yeah.  It was in effect?

20     A    Yes.

21     Q    You were still an authorized dealer?

22     A    Yes, yes.

23     Q    Okay.  4.2, it says:  The dealer shall

24   purchase the vehicles, the spare parts, and the

25   merchandise only from McLaren, McLaren's associated

1  companies, and McLaren nominated spare parts

2  providers, McLaren's authorized agents, and other

3  authorized dealers.

4          Do you see that?

5      A    I do.

6      Q    Do you know whether all the parts that

7  were purchased in conjunction with the repairs to

8  the McLaren were purchased directly from McLaren?

9          MR. COSGROVE:  Object to form.  Lacks

10 foundation.

11     A    I don't know, because I didn't order them

12 but --

13 BY MS. CHEUNG-TRUSLOW:

14     Q    All right.  Let's go on to the next page.

15 It's Page -- the ninth page of this exhibit.

16     A    Okay.

17     Q    It says:  Maintenance and repair services.

18          It says:  The dealer shall perform the

19 maintenance and repair service in accordance with

20 the McLaren after sales operating standards and

21 other applicable policies and procedures.

22          What is a McLaren after sales operating

23 standard?  Is that a physical document?

24          MR. COSGROVE:  Object to form.  Document

25 speaks for itself.

Brandon Saszi - February 27, 2023                39
Video Deposition

```
 1        A     It's -- I believe it's in the dealer

 2   agreement.  It's in this dealer agreement --

 3   BY MS. CHEUNG-TRUSLOW:

 4        Q     I see.

 5        A     -- the operating standards.

 6        Q     So it's an actual document --

 7        A     Yes.

 8        Q     -- right?

 9        A     In the dealer agreement, yes.

10              MS. CHEUNG-TRUSLOW:  So I ask that to be

11   produced either by Ryan or Adam.  I don't have it.

12              MR. COSGROVE:  It's in the agreement.

13              MS. CHEUNG-TRUSLOW:  It is?

14              MR. COSGROVE:  That's a term that's

15   defined in the agreement.

16              MS. CHEUNG-TRUSLOW:  Okay.

17              MR. COSGROVE:  All of these capital

18   terms --

19              MS. CHEUNG-TRUSLOW:  Yes.

20              MR. COSGROVE:  -- are all defined in this

21   agreement.

22              MS. CHEUNG-TRUSLOW:  Yes, I understand

23   that.  But the actual standards are not.

24              MR. COSGROVE:  This is the dealer

25   agreement.  This is what is between the dealer and
```

Regency-Brentano, Inc.

**Brandon Saszi - February 27, 2023**                    40
**Video Deposition**

1   McLaren and has all of their relationship and

2   obligations and duties to each other --

3           THE WITNESS:  Yeah.  In --

4           MR. COSGROVE:  -- set forth.

5           MS. CHEUNG-TRUSLOW:  Right.  I understand

6   that.

7           But if there's a separate document that

8   says McLaren after sales operating standards, I

9   don't have that document.

10           MR. COSGROVE:  I don't believe there is.

11   I believe that that's a term defined within the

12   agreement.

13           MS. CHEUNG-TRUSLOW:  Okay.

14           MR. COSGROVE:  And so when he says it's in

15   the agreement --

16           THE WITNESS:  Yeah.  Everything is in that

17   dealer agreement.

18           MS. CHEUNG-TRUSLOW:  Okay.  I just wanted

19   to make sure that this wasn't like a separate

20   document, you know, a schedule or something.

21           MR. COSGROVE:  No.

22           MR. KLEIN:  It's capitalized because it's

23   a defined term and not because it's a proper noun.

24           MS. CHEUNG-TRUSLOW:  Okay.

25           MR. COSGROVE:  Correct.

```
 1              MS. CHEUNG-TRUSLOW:  Thank you.
 2              MR. KLEIN:  I think.
 3              MR. COSGROVE:  That is accurate.
 4              MS. CHEUNG-TRUSLOW:  All right.  I don't
 5     want to assume.
 6     BY MS. CHEUNG-TRUSLOW:
 7         Q    Okay.  The next page, which falls on the
 8     tenth page of this Exhibit 1, it says:  The dealer
 9     shall be renumerated [sic] for maintenance and
10     repair service properly and validly carried out
11     under any applicable McLaren vehicle warranty policy
12     and/or spare parts warranty policy, by McLaren in
13     accordance with McLaren after sale operating
14     standards.
15              Do you see that?
16         A    Yes.  That's a lot of words in there.
17         Q    I know.
18         A    Let me just read it for --
19              Okay.
20         Q    Do you know whether McLaren renumerated
21     MotorCars of Atlanta for the work that was performed
22     on the McLaren?
23              MR. COSGROVE:  Object to form.  Lacks
24     foundation.  Incomplete hypothetical.
25         A    Some of it could have been, but on this
```

1  particular car I think it was only the recall was

2  paid for by McLaren.

3  BY MS. CHEUNG-TRUSLOW:

4      Q    Okay.  All right.  We are now on the

5  fifteenth page of the exhibit and it starts at 9.27.

6      A    Okay.

7      Q    It says:  Use best endeavors to meet the

8  sales objectives and other commitments set out in

9  the business plan for the applicable year.

10          Do you see that?

11     A    Yes.

12     Q    Are there certain sales objectives that --

13 that MotorCars of Atlanta is supposed to achieve per

14 year?

15     A    Yes.

16     Q    And how is that set?

17     A    Through the manufacturer area of

18 responsibility.

19     Q    Okay.  And what is that for 2021?

20     A    I don't know, off the top of my head.

21     Q    What is it in 2020?

22     A    2020?

23     Q    Yeah.

24     A    I don't know that.

25     Q    Okay.  I mean, just generally.  I mean,

1  ballpark.  What is the sales objectives?  Is that --

2       A    40 -- the number of cars we need to sell

3  per year --

4       Q    Okay.

5       A    -- or they want us to sell per year.

6       Q    All right.  And do you achieve that?

7       A    Yes.

8       Q    All right.  Still Exhibit 1, the sixteenth

9  page of the exhibit, starting at 9.31.

10            I mean, you could just read that to

11  yourself, but it has to do with indemnification,

12  reimbursement, things like that, for defense cost.

13  Have you ever had a situation in which you've been

14  called to indemnify McLaren for any acts -- or any

15  lawsuits?

16       A    No, ma'am.

17       Q    Has Mc -- has MotorCars of Atlanta ever

18  requested indemnification for McLaren as result of

19  any lawsuits?

20       A    No, ma'am.

21       Q    All right.  I'm going to redirect your

22  attention to Exhibit 1 again.  It is the

23  twenty-fifth page of the exhibit.  And if you look

24  at the Bates number on the bottom page it's AFHIC

25  0286.

```
 1         A    Okay.
 2         Q    All right.  It says:  Spare parts
 3    warranty.
 4              Do you see that?
 5         A    Yes, ma'am.
 6         Q    What is that?
 7         A    Warranty on the parts supplied by McLaren.
 8         Q    Okay.  All right.  Page 26 of Exhibit 1,
 9    starts at 18.2.6.
10         A    Okay.
11         Q    Are you familiar with this paragraph?  If
12    you -- please, you know, read it to yourself.
13         A    Okay.  Yes.
14         Q    So what is your understanding of this
15    clause?  And if you don't have an understanding,
16    that's okay too.
17         A    I mean, I just understand it to be if --
18    if we are sued because of a manufacturer failure,
19    they indemnify us.
20         Q    They, being McLaren?
21         A    Yes.
22         Q    Okay.  All right.  The next pages
23    are for -- it falls on Page -- the twenty-eighth
24    page.  It starts at 21.8 and it is Bates Number
25    AFHIC 0289.
```

**Brandon Saszi - February 27, 2023**                    45
**Video Deposition**

```
1              Is says:  Without prejudice to clause
2  15.6, the dealer shall permit McLaren by its duly
3  authorized representatives, upon reasonable prior
4  notice of the dealer, save in circumstances where
5  McLaren reasonably suspects that the dealer is in
6  breach of this agreement where no notice shall be
7  required, from time to time to visit any premises
8  where maintenance and repair service are being
9  performed or the vehicles and/or merchandise and/or
10 spare parts are being stored and/or sold during
11 normal business hours and to meet with the personnel
12 engaged in performing the dealer's obligations under
13 this agreement.
14              Do you see that?
15      A    Yes.
16      Q    Does McLaren have the ability to come to
17 the facility and observe and inspect the work that's
18 being performed by MotorCars of Atlanta?
19      A    Yes, ma'am.
20      Q    Have they done so?  Have they ever done
21 so?
22      A    Has McLaren ever visited?
23      Q    Yes.
24      A    McLaren has been to the dealership, yes.
25      Q    Okay.  How about specifically to the
```

**Regency-Brentano, Inc.**

```
 1   dealership to observe, inspect, to -- you know, the
 2   work of the -- for the maintenance and repair?
 3           MR. COSGROVE:  Object to form.  Vague and
 4   ambiguous.  Overbroad.
 5       A   No, not that I know of.
 6   BY MS. CHEUNG-TRUSLOW:
 7       Q   And what was their purpose for coming to
 8   the dealership?
 9           MR. COSGROVE:  Vague and ambiguous as to
10   time.
11       A   What -- what --
12   BY MS. CHEUNG-TRUSLOW:
13       Q   You said that they've been to the
14   dealership; so I just wanted to know, you know,
15   when they did come to the dealership, you know --
16       A   A dealer visit.
17       Q   -- what was the purpose.
18           And what does that -- what did that
19   entail?
20       A   Going through sales objectives, pipeline
21   for cars coming in, parts objectives, things like
22   that.
23       Q   More of a business meeting?
24       A   Uh-huh.
25       Q   Right?
```

1        A      Yes.

2        Q      Okay.  Not to inspect the work?

3        A      No, ma'am.

4        Q      They have the ability to --

5               MR. COSGROVE:  Object to form.

6   BY MS. CHEUNG-TRUSLOW:

7        Q      -- to inspect your work?

8               MR. COSGROVE:  Object to form.  Vague and

9   ambiguous.  Assumes facts.

10       A      Do they have the ability to?

11  BY MS. CHEUNG-TRUSLOW:

12       Q      Yeah.

13       A      Yes.

14       Q      Do they have the ability to examine the

15  technicians who are working on their products or

16  their --

17       A      Yes.

18       Q      Okay.  And do they ever ask for

19  credentials of the technicians who will work for

20  their -- on their cars?

21       A      They provide the credentials.

22       Q      McLaren provides --

23       A      Yes.

24       Q      -- the credentials?

25       A      Yes.

Brandon Saszi - February 27, 2023                    48
Video Deposition

```
 1        Q     Okay.  And what are the credentials that
 2   they require for technicians to work on their cars?
 3        A     Specialized training by McLaren.
 4        Q     Okay.  How long have you been with
 5   MotorCars of Atlanta?
 6        A     22 years.
 7        Q     And what did you start -- what was your
 8   position when you first started?
 9        A     Car washer.
10        Q     Wow.  Excellent.
11              All right.  Turning your attention to
12   Exhibit Number 2.
13              (Krause Deposition Exhibit P-2 was marked
14   for identification and attached to the transcript.)
15        A     This was one.
16              Okay.
17   BY MS. CHEUNG-TRUSLOW:
18        Q     Have you seen this document before?
19        A     Yes.
20        Q     What is this?
21        A     The service and warranty guide for Super
22   Series McLaren.
23        Q     For what?
24        A     Super Series McLaren.
25        Q     Okay.  Can you take a look at the eighth
```

1  page of the document.  It's MAI Biesecker 0360.

2       A    Okay.

3       Q    I mean -- 5 -- 359 -- sorry --

4       A    Okay.

5       Q    -- MA -- MAI Biesecker 5 -- 359.

6       A    Got it.

7       Q    All right.  So there's a warranty for

8  bumper to bumper for three years?

9       A    Yes.

10       Q    And what does that mean?  Bumper to

11  bumper?

12       A    All of the -- anything in the car that

13  fails as a result of the manufacturer they will

14  repair or replace.

15       Q    Okay.  Who manufactured -- who man -- who

16  actually manufactures the McLaren 3 -- 765 series?

17       A    McLaren.

18       Q    Not another company?

19       A    No, not that I know of.

20       Q    Okay.  Were you at all involved in the

21  transport of the McLaren 765 to Adrian Biesecker?

22       A    No, ma'am.

23       Q    Take a look at Exhibit Number 16, please.

24            (Krause Deposition Exhibit P-16 was marked

25  for identification and attached to the transcript.)

1  BY MS. CHEUNG-TRUSLOW:

2      Q    Were you involved in the physical

3  discovery of documents from MotorCars of Atlanta,

4  you know, related to this litigation?  You know,

5  like the production, the search.

6      A    I was, yes.

7      Q    Okay.  And what was your involvement with

8  that?

9      A    Discussions with managers on what we had

10 and getting it together to send.

11     Q    Okay.  And what -- where did you look for

12 records?

13     A    In archived files.

14     Q    Where are the archived files located?

15     A    The ROs that I found were in a box in a

16 storage location in the dealership.

17     Q    So these are physical files?

18     A    Uh-huh.

19     Q    Okay.

20     A    Yes, ma'am.

21     Q    And what were -- what did you find?

22     A    I don't remember exactly.  I know the

23 repair order.  There were some text messages back

24 and forth from one of the employees.

25     Q    Is that Isaac Robles?

```
 1        A      Yes.
 2        Q      Okay.  And how did you get -- how is --
 3   how did it come about that you had actual text
 4   messages in your archives from an employee?
 5        A      Because we have a texting service that we
 6   use in our service scheduling system.
 7        Q      I see.
 8               And so that was downloaded and printed
 9   somehow?
10        A      It was printed.
11        Q      When was it printed?
12        A      I don't know the exact date.
13        Q      Was it printed contemporaneous with the
14   time that it was created, or after the litigation?
15        A      After it was requested by our attorney.
16        Q      I see.
17               So -- so the text messaging system that
18   your employee used, Isaac Robles, is available kind
19   of online?
20        A      Yes.  They're -- they're in here too.
21        Q      Okay.  And so -- and then you just printed
22   it?
23        A      Yes.
24        Q      Okay.  All right.  What else did you find
25   in your search?
```

Brandon Saszi - February 27, 2023          52
Video Deposition

```
 1        A    Just repair orders and those messages, as
 2   far as I remember.
 3        Q    Okay.  Anything else?
 4        A    I don't recall --
 5        Q    Do you --
 6        A    -- everything.
 7        Q    Do you know whether Mr. Lance kept his own
 8   file on this job?
 9        A    Mr. Lance?
10        Q    Yeah.  Max.
11        A    Oh, oh, Max Landes.
12        Q    Landes.
13        A    I don't know.
14        Q    Okay.  What about Isaac Robles?  Do you
15   know whether he kept a personal file on the work
16   that he did for -- on this car?
17        A    I don't know, no, ma'am.
18        Q    Where is -- do you know where Isaac Robles
19   is working now?
20        A    No, ma'am, I don't.
21        Q    Do you know when he left?
22        A    Yes.
23        Q    When?
24        A    When or why?
25        Q    When.
```

**Regency-Brentano, Inc.**

```
 1          A    I don't remember the date.

 2          Q    Was it last year?

 3          A    I don't remember.

 4          Q    Within the last two years?

 5          A    Within the last two years.

 6          Q    Okay.

 7          A    Yes.

 8          Q    Do you know where he lives?

 9          A    No, ma'am.

10          Q    Do you know what town he lives in?

11          A    No, ma'am.

12          Q    His approximate age?

13          A    No, ma'am.

14          Q    Do you know what the circumstances of him

15     leaving?

16          A    Yes.

17          Q    What was it?

18          A    Gross -- I don't -- you would know the

19     word but -- failure to follow policies and

20     procedures.

21          Q    Okay.  And what kind of failure was he

22     subject -- what were they?

23          A    What were the policies and procedures

24     he --

25          Q    Right.
```

1      A      He accepted a credit card over our limit

2  several times in a very short period after he had

3  been asked not to do that several times.

4      Q      What does that mean?  What -- what do you

5  mean by accept credit cards over the limit?

6      A      We have a limit where then we have to do

7  either ACH or check instead of credit card because

8  of the charges associated with that.

9      Q      You mean associated with -- with a

10  customer?

11      A      Yes.

12      Q      Okay.

13      A      Yes.

14      Q      All right.  So the customer -- let's say

15  it's $1,000 and it's above the credit.

16      A      If it -- if it's above 5,000, we ask the

17  client to use an ACH form instead of a credit

18  card --

19      Q      Okay.

20      A      -- for payment.

21      Q      All right.  And how many times did he

22  violate that rule?

23      A      At least three, two of them in one day.

24      Q      Okay.  And was it associated with the

25  Biesecker matter?

```
 1        A    No, ma'am.
 2        Q    Okay.  So I'm -- back to Exhibit Number
 3  16.  Are you familiar with Exhibit Number 16?
 4        A    Yes.
 5        Q    And how are you familiar with Exhibit
 6  Number 16?
 7        A    I saw it through an e-mail.
 8        Q    Okay.  And through -- from whom?
 9        A    From Mr. Klein.
10        Q    Okay.  And was this -- when you saw this
11  through an e-mail, was already completed?
12        A    Was this what?
13        Q    Was this already completed?
14        A    I don't remember if it was before or after
15  it was completed.  I don't remember.
16        Q    Did you have any input in to the
17  completion of it?
18        A    Yes.
19        Q    Okay.  What was your input?
20        A    Producing documents.
21        Q    Okay.  All right.  So that was the search
22  we just talked about?
23        A    Yes, yes, ma'am.
24        Q    All right.  Okay.  Anything else?
25        A    No, ma'am.
```

1        Q     All right.  So did you go into the

2   technical training module to download all the

3   technical training that Derick received?

4        A     No, ma'am.

5        Q     Okay.  You didn't do that?

6        A     No, ma'am.

7        Q     All right.  So I just want to figure out

8   what part of it you were involved in terms of

9   Exhibit Number 16.  So let's go through Exhibit

10  Number 16.

11       A     Okay.

12       Q     The first response, production of these

13  documents, A -- Exhibit A and things like that.

14       A     Okay.

15       Q     All right.  So you produced what we just

16  discussed; correct?  Just the archive stuff?

17       A     I -- like I said earlier, I don't remember

18  all of the things I was --

19       Q     Okay.

20       A     -- I produced.

21       Q     Just the highlights then.  You remember

22  the texts.  You remember the work orders?

23       A     Yes.

24       Q     You remember some of the photographs --

25       A     Yes.

1     Q     -- of the rodent?

2     A     Yes.

3     Q     What else do you remember?

4     A     That's most of what -- I don't -- I can't

5  think of anything else specifically that I remember

6  producing.

7     Q     All right.  How about Interrogatory Number

8  2 in the responses there?  Were you involved in

9  assembling the list of all of the certifications

10 that Derick holds?

11    A     No, ma'am.

12    Q     All right.  Do you know who did that?

13    A     No, ma'am.

14    Q     All right.  Let's go to 3.

15    A     Exhibit 3?

16    Q     No.  Number 3.

17    A     Okay.

18    Q     Were you involved in production of any of

19 the items requested in or questions as to

20 Interrogatory 3?

21    A     No, ma'am.

22    Q     How about 5?

23    A     No, ma'am.

24    Q     Okay.  So 5 says:  If Krause contends that

25 Adrian Biesecker caused or contributed in any way to

1  the April 24th, 2021, fire in the subject auto --

2  automobile, please describe in detail in each and

3  every act and omission of Mr. Biesecker in the

4  manner in which Krause asserts it caused of

5  contributed to the fire.

6          The answer:  Mr. Biesecker may have been

7  negligent in his transport or operation of the

8  vehicle, including, but not limited to, the manner

9  in which he filled it with fuel, failing to observe

10 warning signs of a potential fire hazard.

11         You didn't answer that, did you?

12    A    No, ma'am.

13    Q    Okay.  So that's not your answer?

14    A    No, ma'am.

15    Q    Okay.  Do you know whether that answer is

16 accurate?

17    A    Just knowing what I know it seems

18 accurate, but I don't know what Mr. Biesecker did --

19    Q    Okay.

20    A    -- specifically.

21    Q    All right.  And what do -- what do you

22 know that may have -- that provides some factual,

23 you know, basis for this statement?  Anything you

24 may have learned, you know, any documents you would

25 have seen or spoken to.  Any facts that support that

1  there was -- there may have been an issue with

2  respect to the manner in which he filled the fuel?

3       A    I don't -- I'm not privy to that

4  specifically.

5       Q    You don't have any facts that actually --

6  that you know of?

7       A    No.  Other than there were some timeline

8  issues with when the car got filled up, things like

9  that.  That's -- that was all I heard, but that was

10  from the attorneys.  I don't -- I don't -- and the

11  fire investigation, not -- not from him, per se.

12       Q    Him being --

13       A    Mr. Biesecker.

14       Q    -- Mr. Biesecker?

15       A    I've never spoken with him.

16       Q    Okay.  So other than what you've heard

17  from other people, do you have any direct knowledge

18  in terms of the facts in which it says the manner in

19  which he filled it was a problem?

20       A    No, ma'am.

21       Q    Okay.  What about failing to observe

22  warning signs of a potential fire hazard?  Do you

23  have any facts that, you know, kind of shows that he

24  failed to observe warning signs of a potential fire

25  hazard?

```
1          A     No, ma'am.
2          Q     All right.  Let's go on to Interrogatory
3     Number 6.  It says:  Please state all facts and
4     supports the first defense in Krause's answer.
5                Do you have any idea what that means?
6          A     I mean, in a general sense I do, but --
7          Q     Okay.
8          A     -- not in probably the sense that you do
9     or Mr. Klein.
10         Q     Okay.  What's the sense that you have
11    about this interrogatory?
12         A     Just that it's the -- why we think it
13    wasn't our fault; right?
14         Q     Yeah, probably.  Okay.
15         A     In simplest terms.
16         Q     Were you involved in answering this
17    question?
18         A     Involved?  Yes.
19         Q     Yes.
20                How were you involved in Interrogatory 6?
21         A     I would have talked to the service
22    director and the technician to get their thoughts on
23    it.
24         Q     Okay.  All right.  So let's be more
25    specific, okay, because it asks for first defense in
```

1    Krause's answer.  So I'm going to refer you

2    specifically to Exhibit Number 17.

3           A     Okay.

4                 (Krause Deposition Exhibit P-17 was marked

5    for identification and attached to the transcript.)

6           A     I'm there.

7    BY MS. CHEUNG-TRUSLOW:

8           Q     All right.  Are you familiar with Exhibit

9    Number 17?

10          A     Yes.

11          Q     How have you become familiar with Exhibit

12   Number 17?

13          A     Well, a lot of these look the same to me;

14   so I believe I was e-mailed this, but I don't -- I

15   don't know if this is the exact sheet.  I -- I'm not

16   sure.

17          Q     Fair enough.  I don't expect you --

18          A     Yeah.  There's just -- they all -- all

19   these legal documents kind of look the same when

20   they come over and there's a lot of them.

21          Q     Let me ask you this:  Are you the point

22   person at MotorCars of Atlanta who are -- who's

23   overseeing this litigation?

24          A     No, ma'am.

25          Q     Who is?

1      A    Our insurance company.

2      Q    Okay.  But you're involved in the sense

3  that if there's information that somebody needs, if

4  you have it, you give it?

5      A    Yes, ma'am.

6      Q    Okay.  All right.  Exhibit Number 17 --

7  I'm going to represent to you -- is the Answer and

8  Additional Defenses of Defendant Krause Family

9  MotorCars.

10          All right.  So this is essentially your

11  response to the compliant that was filed; so these

12  are, like, you know, an order of the various items

13  that provides the defenses.

14          So Exhibit Number 16 asked for the first

15  defense.

16      A    Okay.

17      Q    You could just put it next -- side to

18  side.

19      A    Okay.  Okay.

20      Q    So look at Exhibit Number 16.

21      A    So the first defense was Number 6; right?

22      Q    That's right.

23      A    Exhibit 16.

24      Q    Right.

25      A    Okay.

1      Q     And then put 17 next to it.

2      A     Okay.

3      Q     And you see first defense?

4      A     Yes.

5      Q     Yeah.  So Interrogatory Number 6 asks for

6   facts that support the first defense which is in

7   Exhibit Number 17.  And Exhibit Number 17 first

8   defense says:  The complaint fails to state a claim

9   or cause of action against this defendant for which

10  relief may be granted and therefore this complaint

11  shall be dismissed.

12         I know it's all legalese.

13     A     Yes.

14     Q     So it only asks for facts.  So do you have

15  any facts that support this?

16     A     The rodent damage on the car when it came

17  it would -- I mean, would, to me, seem like

18  something that could cause a lot of things to go

19  haywire.  And the fact that they didn't want to fix

20  everything in the car to save money.

21     Q     Okay.  Let's talk about that.

22     A     Okay.

23     Q     Let's talk about that.  All right.  So do

24  you think that whatever rodent damage was fixed at

25  the time MotorCars of Atlanta finished their work?

**Regency-Brentano, Inc.**

1     A    I'm sorry.  Can you ask that one more --

2  because I --

3     Q    Sure.

4     A    I know what you're asking but I want to

5  make --

6     Q    Of course.

7     A    I want to make sure I answer it correctly.

8     Q    You said maybe there was some rodent

9  damage and, you know, it did some damage; right?

10    A    Right.  Definitely there was rodent

11  damage.

12    Q    Right.

13    A    I didn't say maybe.

14    Q    Do you believe that the rodent damage that

15  came in, you know, when it came to the MotorCars of

16  Atlanta was completely fixed before it left

17  MotorCars of Atlanta?

18    A    No.

19    Q    You don't think that there -- so you think

20  that there might be additional rodent damage that

21  wasn't fixed?

22    A    There were -- yes, I do.

23    Q    Tell me about that.

24    A    There were things that we told the client

25  who had brought it in --

```
1        Q     Okay.
2        A     -- that needed to be fixed and they
3   declined to fix them --
4        Q     And what were --
5        A     -- because of the cost.
6        Q     What were they specifically?
7        A     I -- I don't know the -- I know there was
8   some foam, things like that.  I don't know the
9   specific things that were turned down.
10             I do know that they really just wanted the
11  fault off so they could sell the car --
12       Q     Okay.
13       A     -- and they didn't want to go much further
14  than what that would take.
15       Q     All right.  So let's look at the work
16  order, which is Exhibit Number 7.  So if you pull
17  the work order and so you have these three pieces of
18  paper now -- Exhibit 7, Exhibit 17, and 16 -- in
19  front of you.
20       A     Okay.  Let me get these two on the side
21  and then find -- what's the exhibit?
22       Q     7, please.
23       A     Okay.
24       Q     All right.  So let's make sure you have
25  17, 16, and 17 -- no --
```

1        A    16, 17.

2        Q    16, 17, right.

3        A    Got 'em.

4        Q    All right.  So let's look at 7.  You said

5    there were some items that were rodent damage that

6    were not repaired or replaced and you said maybe

7    something about the foam.  All right.  So that's

8    Number 2?

9        A    Number 2?

10       Q    On Exhibit 7.

11            Is that Item Number 2?

12       A    Yes.

13       Q    Okay.

14       A    That is on that.

15       Q    All right.  So what you're referring to is

16   the foam placement blocks.  Is that what you're

17   saying?

18       A    I do know that was part of it, yes.

19       Q    Okay.  So there was some damage from the

20   rodent for -- on the foam placement blocks and the

21   customer didn't want that replaced?

22       A    Yes, ma'am.

23       Q    Do you know what the extent of the damage

24   was to the foam placement block?

25       A    No, ma'am.

1      Q    Do you know whether by not repairing that
2    would cause a fire?
3      A    I do not, ma'am.
4      Q    All right.  So let's talk about any other
5    items that you thought that was rodent damage but
6    wasn't fixed.  What other items?
7      A    That is all I know -- that I know of.
8      Q    Okay.
9      A    I don't know what other things they did
10   not elect to fix.
11     Q    Okay.  Do you know whether there --
12   whatever they elected not to fix, did those items
13   not being fixed cause the fire?
14     A    I don't know what else they -- that's
15   what -- I don't know anything else that they elected
16   not to fix.
17     Q    Okay.  I just want to be thorough.
18     A    Yes, I understand.
19     Q    Okay.  Exhibit Number 17 again, the first
20   defense.  All right.
21     A    Okay.
22     Q    The complaint fails to state a claim or
23   cause of action against this defendant for which
24   relief may be granted.  Therefore, this complaint
25   should be dismissed.

**Brandon Saszi - February 27, 2023**                    68
**Video Deposition**

```
 1              And one of the things you said was
 2   there -- well, there was, you know, rodent damage
 3   that wasn't fixed when it left the MotorCars of
 4   Atlanta because the customer didn't want it fixed,
 5   okay; right?
 6        A    Not everything.
 7        Q    Right.
 8        A    Yes.
 9        Q    Right.  Right.  Some of the --
10        A    Yes.
11        Q    -- things?
12        A    Some of the things were not repaired.
13        Q    One of the things is the foam?
14        A    Yes.
15        Q    Okay.
16        A    That is one I do know.
17        Q    Right.  And you just don't remember
18   anything else?
19        A    I don't remember the other -- if there's
20   anything else.
21        Q    Do you know whether any of the items that
22   was not repaired from the -- from the rodent damage
23   caused the fire?
24        A    Sorry.  Ask that one more time.
25        Q    Of the items that were not repaired or
```

**Regency-Brentano, Inc.**

1   replaced, you know, from the rodent damage, caused

2   the fire?

3        A    I don't know.

4        Q    Anything else that you have for just facts

5   that -- to support the first defense?

6        A    No, ma'am.

7        Q    All right.  How about the second defense?

8   What facts do you have to support the second

9   defense?  And it's -- and it says:  Plaintiff is

10  barred from seeking special damages, which are not

11  specifically pled pursuant to O.C.G.A. Section

12  9-11-9G.

13       A    I don't know what that means.

14       Q    Okay.  Third defense?  What facts do you

15  have that set forth no act or omission on the part

16  of the defendants constitutes negligence and no act

17  or omission was a proximate cause of any alleged

18  injury to the plaintiff?  Do you know what it means?

19       A    I do know what that means.

20            No act or omission on the part of this

21  defendant constitutes negligence and no act or

22  omission was the proximate cause of any alleged

23  injury to the plaintiff.

24            I mean, the only thing I would say to that

25  is the -- there was a fire investigation.  I mean, I

 1   think that would have cleared most of that up.

 2          I don't -- I don't have anything specific

 3   to add to that.

 4      Q    Okay.  If you want to refer to the fire

 5   investigation, that's fine.  But I -- I just want to

 6   have your understanding of any, you know, facts, you

 7   know, like things that you learned.  Facts, not

 8   opinions.  Okay?

 9      A    Yeah.

10      Q    I'm not interested in opinions --

11      A    Yeah.

12      Q    -- from you at least for this -- for the

13   purpose of my question.  Just facts.

14          You know, what do you have to show that

15   MotorCars of Atlanta was not culpable for the fire?

16   Essentially that's what it says.

17      A    I don't have anything to add.

18      Q    What do you mean, add?

19      A    No.  I mean, I don't have anything to add

20   to what has already been said.

21      Q    Okay.  So the defense so far is -- so let

22   me ask you this -- maybe a broader question.  Why do

23   you believe MotorCars of Atlanta is not responsible

24   for the fire?  Just facts.  You know, don't have to

25   go into opinions or how you derive at the opinions.

```
 1       A    I -- I don't know, because I wasn't there
 2  when the car caught fire.  I'm not privy to the
 3  technical side of the investigation.  So I don't --
 4  I don't know.
 5       Q    Okay.  So -- but -- but you as an owner of
 6  MotorCars of Atlanta -- do you have a position as to
 7  why you're not responsible factualwise?
 8            MR. KLEIN:  Okay.  Asked and answered.
 9            You can go ahead.
10       A    As an owner, do I have a position to why
11  this --
12  BY MS. CHEUNG-TRUSLOW:
13       Q    Why you're not responsible.
14       A    I mean, it's -- again, it's not a factual
15  opinion.  It's my opinions of what we did and how
16  the car left and --
17       Q    Okay.  So let -- let's talk about what you
18  did.  Is there anything that you could think of that
19  you did could -- could have caused a fire?
20       A    In the -- me, myself?
21       Q    The company.  I know you didn't touch the
22  car.
23       A    No, no.
24       Q    Okay.  Do you know how the fire started?
25       A    He -- yes.
```

1      Q     How did the fire -- how did the fire

2  start?

3      A     He was filling his gas tank and it caught

4  fire.

5      Q     Have you -- have you had any failure

6  analysis training?

7      A     No, ma'am.

8      Q     Do you know how -- what -- do you know

9  what the origin of the fire is?

10          MR. COSGROVE:  Lacks foundation.  Calls

11  for speculation.

12     A     No, ma'am.

13  BY MS. CHEUNG-TRUSLOW:

14     Q     All right.  The eighth defense, which is

15  on Exhibit 17, Page 2.

16     A     Okay.

17     Q     It says:  Defendant shows at the time of

18  the incident complained of was confronted with a

19  sudden emergency in terms of law, which was caused

20  by plaintiff and is not liable to plaintiff for any

21  injuries or damages caused by such emergency.

22          Do you know what that means?

23     A     I think you're going to have to unpack

24  that one for me a little bit.

25     Q     I just wanted to know if you understand

1   it.  That's all.

2        A    In this -- am I the defendant?

3        Q    Yes, yes --

4        A    Okay.

5        Q    -- right.

6        A    Defendant shows -- I don't understand it.

7   I'm sorry.

8        Q    Okay.  And that's fine.  You know, just

9   because I ask the question, doesn't mean I expect

10  you to know all the answers.

11       A    Yeah.

12       Q    Have you spoken to Pat Earley of JS Held?

13       A    Not about this.

14            Well, gosh, I don't -- I don't know.

15            MR. KLEIN:  You'd probably remember.

16       A    Well, I know Pat, because I've talked to

17  him before.  But I don't remember if we had ever

18  talked about -- if we had talked since this and

19  about this.  I'm assuming -- I shouldn't assume, but

20  I'm assuming that's what you're asking about.

21  BY MS. CHEUNG-TRUSLOW:

22       Q    Yeah.  Your best memory.  What did you

23  talk to Pat about?

24       A    I believe he had some questions.  It was a

25  long time ago.  I don't -- I don't remember exactly.

1  I think he asked some questions.

2      Q    About this fire?  About something

3  unrelated?

4      A    I can't remember.  I'm sorry, ma'am.

5  Because I've talked to Pat on a couple of different

6  occasions and I don't remember if I spoke to him

7  specifically about this case.

8      Q    Okay.

9      A    Sorry.

10     Q    So if you don't remember that you spoke to

11 him about this specific case, what other occasions

12 would you be speaking to Pat about?

13     A    He knew an attorney friend of -- I don't

14 even remember the circumstance, to be honest with

15 you.  I think he was asking me questions about a car

16 that he was working with or something.  I don't -- I

17 honestly don't remember.  It was so long ago.

18     Q    Was it a -- kind of a business

19 communication or a personal kind of communication?

20     A    It was -- it was business.

21     Q    Okay.  And how do you know Pat?

22     A    I believe I met him through McLaren, but

23 long time ago.  I mean, not on this case.  I just --

24 there was a brief, quick introduction conversation.

25 I just -- I don't remember if it was after this case

1  or before it.  Sorry.  I know that's --

2      Q    Okay.  So when you said that you spoke to

3  Pat Earley, you just don't have a specific memory as

4  to whether you spoke to him before or after this

5  case?

6      A    I don't.

7      Q    Okay.  And you don't recall what the --

8  vaguely recall what the subject was about some other

9  car?

10     A    It was about a car.  And I don't remember

11 the -- the subject.  I don't remember if it was

12 about this case or just something else he was doing

13 and he was asking my opinion on something.

14     Q    Okay.

15     A    I just can't remember.

16     Q    All right.  Did you offer any opinion if

17 there was --

18     A    Yes.

19     Q    And what -- do you remember what you said?

20     A    No, no, ma'am.

21     Q    All right.  Did he speak specifically to

22 you about this case?

23     A    Not that I recall.

24     Q    Do you know whether Pat Earley spoke to

25 Derick Lee about this case?

1       A    I do not know.

2       Q    Did you take a -- is there any recorded

3  statement from Derick Lee about the work he

4  performed on this case that you guys internally did?

5       A    No, ma'am.

6       Q    What quality control is there for the

7  performance of the technicians?

8       A    Could you be more specific.

9       Q    Sure.

10            When a technician is working on whatever

11  work order there is, is there any type of oversight,

12  some supervision of the work that's being performed?

13      A    Yes.  The car is generally test driven

14  afterwards and then cleaned and looked over by the

15  advisor before given back to the client.

16      Q    Okay.  So this is after the car is be --

17  is already put back together?

18      A    Yes.

19      Q    Okay.  Before the car is being put --

20  before the car is put back together, is there any

21  type of oversight of the work that's performed?

22      A    Oversight?  Like --

23      Q    Yes.  Supervision.  Hey, let me take a

24  look at what you did, let me make sure that the

25  clamp is on, let me make sure that this connection

1  is on.  Is there any oversight about that?

2      A    That's all shaken out in the test drive

3  afterwards.

4      Q    Okay.  So you rely on the parts being put

5  together and if the test drive shows there's a

6  clinking-clanking noise or sensor -- sensor lights

7  going on, then that's how you guys do the test?

8      A    It -- it depends on the repair.

9      Q    Okay.  What about this repair?  What

10 quality control was performed?

11     A    I don't specifically know on this exact

12 repair.

13          MS. CHEUNG-TRUSLOW:  Okay.  I'm almost

14 done.  Let me get -- one minute and we --

15          THE WITNESS:  That's okay.

16          MS. CHEUNG-TRUSLOW:  -- can go off the

17 record.

18          THE WITNESS:  Okay.

19          THE VIDEOGRAPHER:  You want to go off the

20 record?

21          MS. CHEUNG-TRUSLOW:  Yes, please.

22          THE VIDEOGRAPHER:  3:40 p.m., we're off

23 the record.

24          (Off-the-record discussion.)

25          THE VIDEOGRAPHER:  3:40 p.m., we're back

**Brandon Saszi - February 27, 2023**                    78
**Video Deposition**

1   on the record.

2   BY MS. CHEUNG-TRUSLOW:

3       Q    Brandon, can you take a look at Exhibit

4   Number 20, please.

5       A    Sure.

6            Okay.

7       Q    Have you seen Exhibit 20 before?

8       A    No, ma'am.

9       Q    Look at Exhibit Number 5, please.

10      A    You want me to keep 20 out?

11      Q    No.

12      A    Okay.

13           MR. KLEIN:  It's right there.

14      A    Right here.

15  BY MS. CHEUNG-TRUSLOW:

16      Q    Okay.  Have you seen Exhibit Number 5

17  before?

18      A    Not that I recall, no.

19      Q    This is a report from Pat Earley.

20      A    Okay.

21      Q    You haven't seen this?

22      A    Not that I recall.

23      Q    Look at Exhibit Number 18, please.

24           (Krause Deposition Exhibit P-18 was marked

25  for identification and attached to the transcript.)

```
 1        A     Did you say 18?  I'm sorry.

 2   BY MS. CHEUNG-TRUSLOW:

 3        Q     18.

 4        A     18.

 5              MR. KLEIN:  There it is.  It's under the

 6   pictures.

 7        A     Okay.

 8   BY MS. CHEUNG-TRUSLOW:

 9        Q     Have you seen this report before?

10        A     No, ma'am.

11              MS. CHEUNG-TRUSLOW:  That's all the

12   questions I have for you.  Thank you.

13              MR. COSGROVE:  I just have a few for you.

14   Are you okay to go?

15              THE WITNESS:  Of course, yeah.

16        EXAMINATION BY COUNSEL FOR THE DEFENDANTS

17   BY MR. COSGROVE:

18        Q     Do you have an understanding that there is

19   McLaren Automotive, Inc. and there is McLaren

20   Automotive, Limited?

21        A     Yes.

22        Q     And one of them is the United States

23   company, McLaren Automotive, Inc., and McLaren

24   Automotive, Limited is the U.K. company?

25        A     Yes.
```

1     Q    Do you understand the difference between

2   two?  It's fine if you don't.

3     A    I mean, when you ask it like that, no.

4     Q    Okay.  In the dealer agreement there's

5   obviously a lot of terms and different things about

6   the general relationship between McLaren Automotive,

7   Inc. and Krause Family MotorCars; correct?

8     A    Yes.

9     Q    And there's something similar with the

10  other manufacturers and distributors that you work

11  with; is that correct?

12    A    Yes.

13    Q    Even though there's this agreement, Krause

14  Family MotorCars is a separate entity from McLaren

15  Automotive, Inc.; is that correct?

16    A    Yes.

17    Q    And McLaren Automotive, Inc. doesn't barge

18  through your door and tell you, you have to do this

19  right now, because we're in charge of you; right?

20    A    Yes, they don't.

21    Q    I believe you mentioned there before when

22  we were talking about the repair to the vehicle

23  that's at issue and you said that the only thing

24  that -- that was reimbursed was for the recall work;

25  is that right?

```
 1        A     Yes.
 2        Q     And that's not unusual, right, that
 3   there's some things that will be warranty or recall
 4   that's reimbursed and there will be other things
 5   that are nonwarranty items; right?
 6        A     Yes.
 7        Q     The rodent damage that was repaired in
 8   this -- this repair was not a warranty repair; is
 9   that correct?
10        A     Correct.
11        Q     Have you ever had rodent damage as a
12   warranty repair with a dealer?
13        A     Not that I can ever recall.
14        Q     Because that's not something that's a
15   manufacturer covered --
16        A     It's -- yeah, it's a not manufacturer
17   defect or failure.
18        Q     Right.  And you were also asked some
19   questions about the McLaren warranty.  Do you recall
20   that?
21        A     Yes.
22        Q     And you were asked about it being bumper
23   to bumper and you said that that covers everything
24   on the vehicle essentially?
25        A     Yes.
```

1        Q     There are exclusions and limitations to

2   that, though; right?

3        A     Absolutely.

4        Q     For instance, here, rodent damage is

5   something that would not be included in the

6   warranty?

7        A     Outside influence, yes.

8        Q     Right.  So even though it's so-called

9   bumper to bumper, that doesn't mean that everything

10  and everything under the sun will be covered on that

11  vehicle; right?

12       A     No, sir.  As I said, manufacturer defect

13  or failure.

14       Q     So what I said is correct?

15       A     Yes.

16             And just -- I don't know if I can add to

17  that, but there is exclusions in the back of the

18  warranty book that say what's excluded and, you

19  know, if you track a car without an inspection

20  there's a lot of things that can -- you know, if you

21  put aftermarket parts on that are not approved by

22  the manufacturer, things like that.  There are

23  things in the warranty book that I don't know if

24  they're in there.

25             MR. KLEIN:  But what if they look really

1   cool?

2            THE WITNESS:  Yeah.  They still won't

3   cover them, yeah.

4   BY MR. COSGROVE:

5      Q     When it comes to the day-to-day operations

6   at the dealership, the dealership is in control of

7   itself; correct?

8      A     Yes.

9      Q     And you guys, whether it's you or someone

10  else at the dealership, makes the decisions of what

11  to do on that particular day, how to do it, things

12  like that?

13     A     Yes.

14     Q     Do you know if McLaren Automotive, Inc.

15  has any type of representative in Atlanta, or

16  Georgia even?

17     A     No.

18     Q     No, they don't, or, no, you don't know?

19     A     They don't.

20           Well, that we deal with at -- the

21  representatives that we deal with are not.

22     Q     Right.  Is your understanding that McLaren

23  Automotive, Inc. is actually a relatively small

24  number of employees that they have?

25     A     Yes.

1      Q    So since there's a limited number of

2  employees and you're not aware of anyone in Georgia,

3  they can't just drop by at the drop of a hat,

4  because they're not here, as far as you know; is

5  that right?

6      A    Yes.

7           MR. COSGROVE:  Okay.  I don't think I have

8  any other questions.

9    FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFF

10  BY MS. CHEUNG-TRUSLOW:

11      Q    How many employees does McLaren

12  Automotive, Inc. have?

13      A    I am not sure about the exact number.

14      Q    Approximately?

15      A    10, 15.

16           MR. COSGROVE:  I'm just going to object to

17  lacks foundation.

18      A    I don't know approximate.  I don't -- I

19  don't I know their exact structure.

20  BY MS. CHEUNG-TRUSLOW:

21      Q    Okay.  Because you said that -- when you

22  were asked -- they don't have that many employees;

23  right?  You said, yeah.  So what did you understand

24  not too many employees mean?

25      A    It means in the U.S. it's not as big of a

1   company as some of our other manufacturers, with as

2   many people that we're having to deal with.  I don't

3   have the exact count.  There's not -- there's not as

4   many people in the U.S. that -- that we deal with on

5   a day-to-day basis as some of the other

6   manufacturers.

7        Q    I see.

8             And how many people do you deal with

9   directly with the -- with McLaren -- McLaren?

10       A    I would say four to five.

11            MS. CHEUNG-TRUSLOW:  Okay.  Thank you.

12            MR. KLEIN:  Just briefly.

13        EXAMINATION BY COUNSEL FOR THE DEFENDANT

14   BY MR. KLEIN:

15       Q    Do you remember testifying before about

16   the sales objectives that --

17       A    Yes.

18       Q    -- are under -- under your agreement with

19   McLaren?

20       A    Yes.

21       Q    You described that as the number of cars

22   that McLaren would like you to sell?

23       A    Yes.

24       Q    Is that -- does that count used car sales

25   or is that just new cars from McLaren?

1        A     We have used car objectives, but I believe

2   in -- what we have here it was just about new car

3   sales.

4               MR. KLEIN:  That's all I have.

5               MS. CHEUNG-TRUSLOW:  Thank you.

6               THE WITNESS:  Thank you.

7               THE VIDEOGRAPHER:  3:48 p.m., we're off

8   the record.

9               (Deposition concluded 3:48 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            CERTIFICATE OF COURT REPORTER

2

3  STATE OF GEORGIA:

4  COUNTY OF COBB:

5

6          I hereby certify that the foregoing

7  transcript was taken down, as stated in the caption,

8  and the questions and answers were reduced to

9  typewriting under my direction; that the foregoing

10  86 pages represent a true and correct transcript of

11  the evidence given upon said proceeding.

12

13         This the 13th day of March 2023.

14

15

16

17     MICHELLE LOWE, RPR, CCR-2748

18

19

20

21

22

23

24

25

1          DISCLOSURE OF COURT REPORTER

2

3          Pursuant to Article 10.B of the Rules and

4    Regulations of the Board Of Court Reporting of the

5    Judicial Council of Georgia, I make the following

6    disclosures:

7          That I am not disqualified for a

8    relationship of interest under the provisions of

9    OCGA Section 9-11-28(c); that I am a Georgia

10   Certified Court Reporter; that I am a representative

11   of MLowe Reporting, LLC; that MLowe Reporting, LLC,

12   was contacted by Regency-Brentano, Inc. to provide

13   court reporting services for this deposition; that

14   all financial arrangements beyond the usual and

15   customary rates have been disclosed and offered to

16   all parties; and that I will not be taking this

17   deposition under any contract prohibited by Georgia

18   law.

19

20          This the 27th day of February 2023.

21

22

23                                    _____

24          MICHELLE LOWE, RPR, CCR-2748

25

American Family Insurance, et al. v.
McLaren Automotive, et al.

Video Deposition

Brandon Saszi
February 27, 2023

| **$** | | | |
|---|---|---|---|

**$1,000 (1)**
54:15

| **[** | | | |
|---|---|---|---|

**[sic] (2)**
13:18;41:9

| **A** | | | |
|---|---|---|---|

**ability (5)**
23:21;45:16;47:4,
10,14
**above (2)**
54:15,16
**Absolutely (1)**
82:3
**accept (1)**
54:5
**accepted (1)**
54:1
**accessories (1)**
25:1
**accommodate (1)**
7:13
**accordance (2)**
38:19;41:13
**according (1)**
22:22
**accurate (3)**
41:3;58:16,18
**ACH (2)**
54:7,17
**achieve (2)**
42:13;43:6
**acronym (1)**
24:4
**acronyms (1)**
33:18
**act (5)**
58:3;69:15,16,20,
21
**action (2)**
63:9;67:23
**acts (1)**
43:14
**actual (3)**
39:6,23;51:3
**actually (7)**
14:8;15:25;16:4;
36:21;49:16;59:5;
83:23
**Adam (2)**
21:3;39:11
**add (5)**
70:3,17,18,19;
82:16
**addition (2)**
12:25;13:12
**additional (3)**

**25:18;62:8;64:20**
**address (1)**
11:11
**Adrian (2)**
49:21;57:25
**advice (2)**
8:8;31:7
**advisor (2)**
14:11;76:15
**affirmed (1)**
6:7
**AFHIC (2)**
43:24;44:25
**aftermarket (1)**
82:21
**afternoon (1)**
6:12
**afterwards (2)**
76:14;77:3
**again (7)**
17:13;33:7,25;36:8;
43:22;67:19;71:14
**against (2)**
63:9;67:23
**age (1)**
53:12
**agents (1)**
38:2
**ago (3)**
73:25;74:17,23
**agreement (25)**
16:21;18:7,14,16,
23;19:5;20:22;26:17;
37:11,12;39:2,2,9,12,
15,21,25;40:12,15,17;
45:6,13;80:4,13;
85:18
**ahead (2)**
19:3;71:9
**alleged (2)**
69:17,22
**almost (1)**
77:13
**Alpharetta (1)**
11:12
**ambiguous (11)**
22:1,13;23:6;30:1;
31:21;35:2,20;37:16;
46:4,9;47:9
**analysis (1)**
72:6
**and/or (4)**
41:12;45:9,9,10
**Angela (5)**
11:18,20,21,23,23
**answered (1)**
71:8
**APPEARANCE (1)**
2:1
**applicable (4)**
28:17;38:21;41:11;
42:9
**applies (1)**

**32:4**
**appointed (2)**
21:6;27:11
**appointment (3)**
21:10;36:24;37:3
**appoints (1)**
37:5
**approval (2)**
35:9,21
**Approved (3)**
27:10,16;82:21
**approximate (2)**
53:12;84:18
**Approximately (1)**
84:14
**April (1)**
58:1
**Arch (1)**
2:6
**archive (1)**
56:16
**archived (2)**
50:13,14
**archives (1)**
51:4
**area (2)**
20:12;42:17
**around (1)**
8:4
**aside (1)**
17:1
**assembling (1)**
57:9
**assert (1)**
25:17
**asserts (1)**
58:4
**assets (2)**
13:1,13
**associated (4)**
37:25;54:8,9,24
**association (1)**
11:10
**assume (3)**
14:22;41:5;73:19
**Assumes (1)**
47:9
**assuming (2)**
73:19,20
**Aston (1)**
12:23
**Atlanta (44)**
8:15,23;9:1;10:1,3,
11,20,23,23,24,24,25,
25;12:20;13:17;
16:12,23;17:22;
19:23;20:3,4;22:9,22;
27:16;28:4;29:8;
32:23;33:1;36:14;
41:21;42:13;43:17;
45:18;48:5;50:3;
61:22;63:25;64:16,
17;68:4;70:15,23;

**71:6;83:15**
**attached (5)**
18:2;48:14;49:25;
61:5;78:25
**attention (2)**
43:22;48:11
**Attorney (4)**
2:4,14;51:15;74:13
**attorneys (1)**
59:10
**audible (1)**
7:8
**authorized (13)**
12:2;21:7,10,16,16,
18;27:14;37:6,10,21;
38:2,3;45:3
**Auto (2)**
33:12;58:1
**Automobile (2)**
12:21;58:2
**automobiles (1)**
12:22
**Automotive (16)**
2:11;16:8;18:5;
32:21;33:8,8;79:19,
20,23,24;80:6,15,17;
83:14,23;84:12
**available (1)**
51:18
**Avenue (1)**
2:17
**aware (1)**
84:2
**away (1)**
11:24

| **B** | | | |
|---|---|---|---|

**back (7)**
50:23;55:2;76:15,
17,20;77:25;82:17
**ballpark (1)**
43:1
**barge (1)**
80:17
**barred (1)**
69:10
**based (1)**
8:4
**basis (2)**
58:23;85:5
**Bates (2)**
43:24;44:24
**become (1)**
61:11
**behalf (4)**
2:2,11;30:8;36:2
**bell (1)**
9:16
**best (2)**
42:7;73:22
**Biesecker (10)**
49:1,5,21;54:25;

**57:25;58:3,6,18;**
**59:13,14**
**big (1)**
84:25
**bit (1)**
72:24
**block (1)**
66:24
**blocks (2)**
66:16,20
**body (3)**
27:25;28:6,12
**book (2)**
82:18,23
**Boston (1)**
2:7
**bottom (1)**
43:24
**box (1)**
50:15
**BRANDON (6)**
6:6,16,23,25;7:17;
78:3
**breach (1)**
45:6
**break (3)**
7:11,13,15
**Brian (3)**
9:14,15,22
**brief (1)**
74:24
**briefly (1)**
85:12
**bring (1)**
31:16
**bringing (1)**
30:14
**brings (1)**
29:19
**broader (1)**
70:22
**brought (1)**
64:25
**building (2)**
13:9,10
**buildings (1)**
13:4
**bulk (1)**
30:23
**Bulletins (1)**
31:9
**bumper (8)**
49:8,8,10,11;81:22,
23;82:9,9
**business (9)**
11:7;12:19;16:13,
15;42:9;45:11;46:23;
74:18,20
**buy (1)**
34:21

| **C** | | | |
|---|---|---|---|

Case 1:22-cv-01392-LMM   Document 52-3   Filed 04/05/23   Page 91 of 98

American Family Insurance, et al. v.                      Video Deposition                      Brandon Saszi
McLaren Automotive, et al.                                                                      February 27, 2023

**California (1)**
   2:18
**call (2)**
   6:23;30:3
**called (2)**
   33:7;43:14
**Calls (1)**
   72:10
**came (4)**
   16:17;63:16;64:15,
   15
**can (19)**
   6:14,17;7:8;13:16,
   19;15:1;17:8;19:2;
   20:24;24:18;29:16;
   48:25;64:1;71:9;
   77:16;78:3;81:13;
   82:16,20
**capital (1)**
   39:17
**capitalized (1)**
   40:22
**car (39)**
   14:8,11;15:17;
   16:17,19;17:10,18;
   30:4;31:16;32:6;
   35:17,18,20,20,21;
   36:9,11;42:1;48:9;
   49:12;52:16;59:8;
   63:16,20;65:11;71:2,
   16,22;74:15;75:9,10;
   76:13,16,19,20;82:19;
   85:24;86:1,2
**card (3)**
   54:1,7,18
**cards (1)**
   54:5
**carried (1)**
   41:10
**cars (10)**
   19:11;21:19;23:17,
   25;43:2;46:21;47:20;
   48:2;85:21,25
**Carter (1)**
   6:22
**case (12)**
   8:5;30:24;31:13;
   74:7,11,23,25;75:5,
   12,22,25;76:4
**catch (1)**
   13:24
**caught (2)**
   71:2;72:3
**cause (7)**
   63:9,18;67:2,13,23;
   69:17,22
**causes (1)**
   23:2
**certain (2)**
   22:22;42:12

**certification (1)**
   16:8
**certifications (1)**
   57:9
**chance (1)**
   20:24
**charge (4)**
   32:14;34:18;36:14;
   80:19
**charges (1)**
   54:8
**chart (1)**
   9:5
**check (1)**
   54:7
**CHEUNG-TRUSLOW (63)**
   2:3,5;6:11,13;18:3;
   19:7;20:23;21:5,24;
   22:3,5,7,15;23:10;
   25:2,11,23;27:7;30:5;
   31:3,6,23;32:7;35:4,
   15;37:18;38:13;39:3,
   10,13,16,19,22;40:5,
   13,18,24;41:1,4,6;
   42:3;46:6,12;47:6,11;
   48:17;50:1;61:7;
   71:12;72:13;73:21;
   77:13,16,21;78:2,15;
   79:2,8,11;84:10,20;
   85:11;86:5
**chew (1)**
   16:5
**chewed (1)**
   15:24
**chewed-through (3)**
   15:23,25;16:2
**chosen (1)**
   16:19
**circumstance (1)**
   74:14
**circumstances (3)**
   35:14;45:4;53:14
**claim (3)**
   35:22;63:8;67:22
**claims (2)**
   29:5;32:17
**clamp (1)**
   76:25
**clause (2)**
   44:15;45:1
**clauses (1)**
   29:15
**cleaned (1)**
   76:14
**cleared (1)**
   70:1
**client (3)**
   54:17;64:24;76:15
**clients (1)**
   20:19
**clinking-clanking (1)**
   77:6
**collects (1)**

   32:17
**coming (2)**
   46:7,21
**commencement (1)**
   37:5
**commitments (1)**
   42:8
**communication (2)**
   74:19,19
**companies (2)**
   16:16;38:1
**company (16)**
   13:11;19:24,25;
   21:17;32:16,20,25;
   33:12;34:10;36:1;
   49:18;62:1;71:21;
   79:23,24;85:1
**company's (1)**
   28:8
**compensated (1)**
   19:13
**complained (1)**
   72:18
**complaint (4)**
   63:8,10;67:22,24
**complete (1)**
   13:20
**completed (3)**
   55:11,13,15
**completely (1)**
   64:16
**completion (1)**
   55:17
**compliant (1)**
   62:11
**comprehend (1)**
   13:25
**computerized (1)**
   24:6
**concluded (1)**
   86:9
**confronted (1)**
   72:18
**conjunction (1)**
   38:7
**connection (1)**
   76:25
**considered (2)**
   34:12;36:7
**constitutes (2)**
   69:16,21
**contemporaneous (1)**
   51:13
**contends (1)**
   57:24
**contract (1)**
   16:21
**contributed (2)**
   57:25;58:5
**control (3)**
   76:6;77:10;83:6
**conversation (1)**
   74:24

**cool (1)**
   83:1
**corporate (1)**
   8:25
**corporation (1)**
   20:7
**correctly (1)**
   64:7
**COSGROVE (46)**
   2:13;18:25;19:3;
   21:23;22:1,4,12;23:5;
   24:22;25:8,15,17;
   27:4;29:23,25;31:1,5,
   20;32:3;35:1,12;
   37:15;38:9,24;39:12,
   14,17,20,24;40:4,10,
   14,21,25;41:3,23;
   46:3,9;47:5,8;72:10;
   79:13,17;83:4;84:7,
   16
**cost (2)**
   43:12;65:5
**COUNSEL (5)**
   2:1;6:10;79:16;
   84:9;85:13
**count (2)**
   85:3,24
**couple (2)**
   34:4;74:5
**course (4)**
   24:21;26:11;64:6;
   79:15
**court (2)**
   6:4;7:8
**cover (1)**
   83:3
**covered (2)**
   81:15;82:10
**covers (1)**
   81:23
**created (1)**
   51:14
**credentials (4)**
   47:19,21,24;48:1
**credit (5)**
   54:1,5,7,15,17
**culpable (1)**
   70:15
**current (1)**
   18:16
**customer (8)**
   29:19;30:4;32:1;
   35:19;54:10,14;
   66:21;68:4
**customers (2)**
   20:18;31:11

**D**

**d/b/a (3)**
   10:4,11;20:5
**d/b/as (1)**
   10:14

**damage (22)**
   14:13,16;15:20;
   16:5;23:3;63:16,24;
   64:9,9,11,14,20;66:5,
   19,23;67:5;68:2,22;
   69:1;81:7,11;82:4
**damages (2)**
   69:10;72:21
**date (4)**
   6:1;37:5;51:12;
   53:1
**daughter (1)**
   11:24
**day (2)**
   54:23;83:11
**day-to-day (3)**
   8:19;83:5;85:5
**deal (6)**
   21:16;83:20,21;
   85:2,4,8
**Dealer (27)**
   18:7,14,16;20:18,
   22;21:7,11;33:16;
   37:6,6,6,21,23;38:18;
   39:1,2,9,24,25;40:17;
   41:8;45:2,4,5;46:16;
   80:4;81:12
**dealer-manufacturer (2)**
   19:6,9
**dealers (3)**
   12:2,5;38:3
**dealer's (1)**
   45:12
**dealership (13)**
   11:13,17;12:1,17;
   45:24;46:1,8,14,15;
   50:16;83:6,6,10
**dealerships (1)**
   12:8
**dealing (1)**
   33:24
**dealings (1)**
   13:17
**decisions (1)**
   83:10
**declined (1)**
   65:3
**defect (2)**
   81:17;82:12
**Defendant (9)**
   2:11;62:8;63:9;
   67:23;69:21;72:17;
   73:2,6;85:13
**defendants (2)**
   69:16;79:16
**defense (15)**
   43:12;60:4,25;
   62:15,21;63:3,6,8;
   67:20;69:5,7,9,14;
   70:21;72:14
**Defenses (2)**
   62:8,13
**defined (5)**

American Family Insurance, et al. v.
McLaren Automotive, et al.

Video Deposition

Brandon Saszi
February 27, 2023

25:18;39:15,20;
40:11,23
**Definitely (1)**
64:10
**department (1)**
17:17
**departments (1)**
17:14
**depends (1)**
77:8
**deposition (8)**
7:18;8:8;18:1;
48:13;49:24;61:4;
78:24;86:9
**Derick (9)**
8:1;13:21;14:7;
36:7;37:13;56:3;
57:10;75:25;76:3
**derive (1)**
70:25
**describe (2)**
29:16;58:2
**described (1)**
85:21
**detail (1)**
58:2
**detailed (1)**
17:16
**deviate (2)**
23:1;24:2
**diagnostic (1)**
23:21
**difference (1)**
80:1
**different (8)**
12:12;17:14,14;
30:12,15;35:13;74:5;
80:5
**direct (1)**
59:17
**directly (3)**
33:24;38:8;85:9
**director (3)**
9:8;14:10;60:22
**discovery (1)**
50:3
**discussed (1)**
56:16
**discussion (1)**
77:24
**Discussions (1)**
50:9
**dismissed (2)**
63:11;67:25
**distribute (2)**
27:13;37:7
**distributes (1)**
31:10
**distributors (1)**
80:10
**DMS (2)**
33:13,15
**document (16)**

24:23;25:8,20;26:5,
6,9,13;27:20;38:23,
24;39:6;40:7,9,20;
48:18;49:1
**documents (5)**
50:3;55:20;56:13;
58:24;61:19
**done (11)**
17:3;22:4;23:1;
29:3;30:4;35:8;36:9,
10;45:20,20;77:14
**door (1)**
80:18
**down (3)**
7:8;24:7;65:9
**download (1)**
56:2
**downloaded (1)**
51:8
**drive (2)**
77:2,5
**driven (1)**
76:13
**drop (2)**
84:3,3
**duly (2)**
6:7;45:2
**duration (1)**
37:10
**during (1)**
45:10
**duties (1)**
40:2

**E**

**Earley (4)**
73:12;75:3,24;
78:19
**earlier (1)**
56:17
**effect (2)**
37:4,19
**effectuate (1)**
35:10
**Eighth (4)**
36:22,22;48:25;
72:14
**either (3)**
23:3;39:11;54:7
**elect (1)**
67:10
**elected (2)**
67:12,15
**else (14)**
13:21;14:23;51:24;
52:3;55:24;57:3,5;
67:14,15;68:18,20;
69:4;75:12;83:10
**em (1)**
66:3
**e-mail (2)**
55:7,11

**e-mailed (1)**
61:14
**emergency (2)**
72:19,21
**employee (2)**
51:4,18
**employees (7)**
14:2;50:24;83:24;
84:2,11,22,24
**employment (2)**
9:4;28:23
**endeavors (1)**
42:7
**enforced (1)**
37:17
**engaged (1)**
45:12
**enough (2)**
26:25;61:17
**entail (1)**
46:19
**entire (1)**
35:9
**entity (1)**
80:14
**equipment (1)**
22:25
**essentially (3)**
62:10;70:16;81:24
**even (5)**
34:9;74:14;80:13;
82:8;83:16
**exact (9)**
14:23;15:18;26:3;
51:12;61:15;77:11;
84:13,19;85:3
**exactly (7)**
15:6,14;16:3;25:21;
26:23;50:22;73:25
**EXAMINATION (4)**
6:10;79:16;84:9;
85:13
**examine (1)**
47:14
**examined (1)**
6:9
**example (2)**
22:21;24:7
**Excellent (1)**
48:10
**excluded (1)**
82:18
**exclusions (2)**
82:1,17
**Exhibit (51)**
15:1,9;17:24;18:1,
4;19:16;36:19,20,22;
38:15;41:8;42:5;43:8,
9,22,23;44:8;48:12,
13;49:23,24;55:2,3,5;
56:9,9,13;57:15;61:2,
4,8,11;62:6,14,20,23;
63:7,7;65:16,18,18,

21;66:10;67:19;
72:15;78:3,7,9,16,23,
24
**expect (3)**
20:18;61:17;73:9
**expects (1)**
22:11
**extent (2)**
7:1;66:23

**F**

**F&I (1)**
9:8
**facility (1)**
45:17
**fact (1)**
63:19
**facts (16)**
47:9;58:25;59:5,18,
23;60:3;63:6,14,15;
69:4,8,14;70:6,7,13,
24
**factual (2)**
58:22;71:14
**factualwise (1)**
71:7
**failed (1)**
59:24
**failing (2)**
58:9;59:21
**fails (3)**
49:13;63:8;67:22
**failure (6)**
44:18;53:19,21;
72:5;81:17;82:13
**Fair (2)**
26:25;61:17
**fairly (1)**
26:13
**falls (3)**
36:21;41:7;44:23
**familiar (9)**
24:4,5;26:4,20;
44:11;55:3,5;61:8,11
**Family (16)**
10:4,13;11:2,8,11;
12:7,11,15,16;13:2,
13;18:6;19:20;62:8;
80:7,14
**far (3)**
52:2;70:21;84:4
**fault (2)**
60:13;65:11
**February (1)**
6:2
**few (1)**
79:13
**fifteenth (1)**
42:5
**figure (1)**
56:7
**file (2)**

52:8,15
**filed (1)**
62:11
**files (3)**
50:13,14,17
**filled (4)**
58:9;59:2,8,19
**filling (1)**
72:3
**financials (1)**
17:22
**find (4)**
18:8;50:21;51:24;
65:21
**fine (3)**
70:5;73:8;80:2
**finish (1)**
10:8
**finished (1)**
63:25
**fire (22)**
58:1,5,10;59:11,22,
24;67:2,13;68:23;
69:2,2,25;70:4,15,24;
71:2,19,24;72:1,1,4,9;
74:2
**first (14)**
6:7;13:25;14:1;
48:8;56:12;60:4,25;
62:14,21;63:3,6,7;
67:19;69:5
**fits (1)**
35:18
**five (1)**
85:10
**fix (13)**
16:19;23:16,21;
29:21;30:2;32:6;
35:20,21;63:19;65:3;
67:10,12,16
**fixed (10)**
16:17;23:25;63:24;
64:16,21;65:2;67:6,
13;68:3,4
**flipping (1)**
34:7
**Floor (1)**
2:6
**foam (7)**
15:24;65:8;66:7,16,
20,24;68:13
**follow (1)**
53:19
**follows (1)**
6:9
**force (1)**
37:13
**Ford (3)**
11:18,20;12:6
**form (16)**
19:1;20:20;21:23;
22:12;23:5;31:1;35:1,
12;37:15;38:9,24;

American Family Insurance, et al. v.
McLaren Automotive, et al.

Video Deposition

Brandon Saszi
February 27, 2023

41:23;46:3;47:5,8;
54:17
**formal (1)**
16:15
**forth (3)**
40:4;50:24;69:15
**found (1)**
50:15
**foundation (4)**
38:10;41:24;72:10;
84:17
**four (1)**
85:10
**friend (1)**
74:13
**front (1)**
65:19
**fuel (3)**
16:5;58:9;59:2
**functions (1)**
17:17
**further (2)**
65:13;84:9

## G

**gamut (1)**
35:9
**gas (1)**
72:3
**Gateway (1)**
2:16
**gather (1)**
29:10
**general (6)**
8:16,19;19:8;35:17;
60:6;80:6
**generally (5)**
27:1;28:25;30:3;
42:25;76:13
**gentleman (2)**
9:3,7
**Georgia (5)**
11:3,12;27:11;
83:16;84:2
**given (1)**
76:15
**GM (2)**
8:18;17:13
**Good (2)**
6:12;18:21
**gosh (1)**
73:14
**governor (1)**
9:17
**granted (2)**
63:10;67:24
**grants (1)**
37:6
**Grause (1)**
12:15
**gray (1)**
27:9

**grayed (2)**
27:20,21
**Gross (1)**
53:18
**guide (1)**
48:21
**gun (1)**
22:6
**guys (4)**
23:1;76:4;77:7;
83:9

## H

**handle (3)**
33:14,19,20
**happens (5)**
21:21;22:8,8,9;23:2
**happy (2)**
7:4,12
**hard (1)**
23:15
**harness (1)**
16:1
**hat (1)**
84:3
**haywire (1)**
63:19
**hazard (3)**
58:10;59:22,25
**head (1)**
42:20
**heard (3)**
13:25;59:9,16
**Held (1)**
73:12
**hereby (1)**
37:5
**hey (2)**
23:19;76:23
**highlighted (2)**
19:16,17
**highlights (1)**
56:21
**Hold (3)**
18:25;29:25;36:18
**holds (1)**
57:10
**honest (1)**
74:14
**honestly (1)**
74:17
**hours (1)**
45:11
**houses (1)**
13:4
**hypothetical (3)**
31:5,20;41:24

## I

**idea (1)**
60:5

**identification (5)**
18:2;48:14;49:25;
61:5;78:25
**Inc (10)**
2:12;33:9;79:19,23;
80:7,15,17;83:14,23;
84:12
**incident (1)**
72:18
**included (4)**
28:8,12;30:20;82:5
**includes (1)**
21:11
**including (2)**
27:24;58:8
**Incomplete (3)**
31:5,20;41:24
**Incorporated (1)**
18:6
**indemnification (2)**
43:11,18
**indemnify (2)**
43:14;44:19
**independent (1)**
23:24;25:24
**influence (1)**
82:7
**information (2)**
17:7;62:3
**initial (1)**
6:19
**initially (2)**
32:9;34:21
**injuries (1)**
72:21
**injury (2)**
69:18,23
**input (2)**
55:16,19
**inspect (4)**
45:17;46:1;47:2,7
**inspection (1)**
82:19
**instance (1)**
82:4
**instead (2)**
54:7,17
**instructions (1)**
22:23
**insurance (1)**
62:1
**interested (1)**
70:10
**internally (1)**
76:4
**Interrogatory (6)**
57:7,20;60:2,11,20;
63:5
**into (4)**
17:16,18;56:1;
70:25
**introduction (1)**
74:24

**inventories (1)**
13:12
**inventory (2)**
13:1,5
**investigation (4)**
59:11;69:25;70:5;
71:3
**invoice (1)**
32:15
**involved (11)**
14:2;26:16;49:20;
50:2;56:8;57:8,18;
60:16,18,20;62:2
**involvement (1)**
50:7
**Isaac (5)**
13:21;50:25;51:18;
52:14,18
**issue (2)**
59:1;80:23
**issues (2)**
21:22;59:8
**Item (1)**
66:11
**items (9)**
57:19;62:12;66:5;
67:5,6,12;68:21,25;
81:5

## J

**Jackson (4)**
16:11,19,22;17:4
**job (1)**
52:8
**JS (1)**
73:12
**judgment (1)**
23:24
**jumping (1)**
22:6

## K

**keep (1)**
78:10
**Kemp (3)**
9:14,15,22
**kept (2)**
52:7,15
**kind (10)**
12:22;17:6;19:18;
23:2;51:18;53:21;
59:23;61:19;74:18,19
**KLEIN (14)**
19:2;21:4;40:22;
41:2;55:9;60:9;71:8;
73:15;78:13;79:5;
82:25;85:12,14;86:4
**knew (1)**
74:13
**knowing (1)**
58:17

**knowledge (1)**
59:17
**Koenigsegg (2)**
10:24;12:24
**Krause (29)**
9:13,23;10:4,13;
11:2,7,10,15,18,20,21,
23;12:7,11,16;13:2,
13;18:1,6;19:20;
48:13;49:24;57:24;
58:4;61:4;62:8;78:24;
80:7,13
**Krause's (2)**
60:4;61:1

## L

**labor (1)**
32:12;34:19
**Lacks (4)**
38:9;41:23;72:10;
84:17
**Lamborghini (2)**
10:23;12:23
**Lance (2)**
52:7,9
**Landes (3)**
13:22;52:11,12
**large (1)**
26:13
**last (4)**
6:17;53:2,4,5
**later (1)**
25:19
**Law (4)**
2:4,5,14;72:19
**laws (1)**
11:3
**lawsuits (2)**
43:15,19
**lay (1)**
19:5
**learned (2)**
58:24;70:7
**leases (1)**
13:10
**least (2)**
54:23;70:12
**leaving (1)**
53:15
**led (1)**
26:17
**Lee (6)**
8:1;13:21;36:7;
37:13;75:25;76:3
**left (6)**
7:20,21;52:21;
64:16;68:3;71:16
**legal (2)**
20:7;61:19
**legalese (1)**
63:12
**liable (1)**

Case 1:22-cv-01392-LMM   Document 52-3   Filed 04/05/23   Page 94 of 98

American Family Insurance, et al. v.
McLaren Automotive, et al.

Video Deposition

Brandon Saszi
February 27, 2023

72:20

**lift (1)**
15:21

**lights (1)**
77:6

**limit (3)**
54:1,5,6

**limitations (1)**
82:1

**limited (4)**
58:8;79:20,24;84:1

**Lincoln (3)**
11:18,20;12:6

**line (2)**
16:5;27:9

**list (1)**
57:9

**litigation (4)**
14:4;50:4;51:14;
61:23

**litigations (1)**
13:19

**little (1)**
72:24

**lives (2)**
53:8,10

**LLC (5)**
10:6;12:14,16;
19:21;20:2

**located (2)**
20:22;50:14

**location (3)**
11:7;37:10;50:16

**long (4)**
48:4;73:25;74:17,
23

**look (17)**
15:1;17:8;32:4;
43:23;48:25;49:23;
50:11;61:13,19;
62:20;65:15;66:4;
76:24;78:3,9,23;
82:25

**looked (1)**
76:14

**lot (7)**
15:24;41:16;61:13,
20;63:18;80:5;82:20

**lots (1)**
35:13

**Lotus (2)**
10:24;12:23

**M**

**MA (1)**
49:5

**ma'am (56)**
7:10,16;8:9;9:22;
11:6;12:3,9,18;14:20;
20:8;21:9,12,14;33:2,
4;34:20,23;37:2;
43:16,20;44:5;45:19;

47:3;49:22;50:20;
52:17,20;53:9,11,13;
55:1,23,25;56:4,6;
57:11,13,21,23;58:12,
14;59:20;60:1;61:24;
62:5;66:22,25;67:3;
69:6;72:7,12;74:4;
75:20;76:5;78:8;
79:10

**MAI (2)**
49:1,5

**maintenance (12)**
21:11,17;27:12,21,
22;28:3;37:9;38:17,
19;41:9;45:8;46:2

**makes (1)**
83:10

**man (1)**
49:15

**management (1)**
33:16

**manager (4)**
8:16;9:8,9,21

**managers (2)**
9:7;50:9

**manner (4)**
58:4,8;59:2,18

**Mansell (1)**
11:12

**manufacture (1)**
19:12

**manufactured (1)**
49:15

**manufacturer (9)**
12:4;31:12;42:17;
44:18;49:13;81:15,
16;82:12,22

**manufacturers (5)**
8:20;32:18;80:10;
85:1,6

**manufactures (1)**
49:16

**many (9)**
17:10,19;54:21;
84:11,22,24;85:2,4,8

**MARIE (4)**
2:3,5;6:13;7:3

marie@cheungtruslowlawcom (1)
2:9

**marked (5)**
18:1;48:13;49:24;
61:4;78:24

**market (1)**
37:7

**Martin (1)**
12:23

**Massachusetts (1)**
2:7

**matter (1)**
54:25

**Max (4)**
13:22;17:8;52:10,
11

**May (10)**
6:23,24;14:23;
26:19;58:6,22,24;
59:1;63:10;67:24

**maybe (5)**
26:19;64:8,13;66:6;
70:22

**Mc (2)**
33:24;43:17

**McLaren (93)**
2:11;10:23,25;12:2,
23;13:18;14:3,14;
18:5,6;20:12;21:1,13;
22:9,11,23;24:3,15,
16;26:2;27:11;28:5,
14,17,21;29:7,8,18;
30:9,21;31:7,9,13;
32:10,13,15;33:3,24;
34:18,25;35:24;
36:14,14;37:5,8,14,
25;38:1,8,8,20,22;
40:1;8;41:11,12,13,
20,22;42:2;43:14,18;
44:7,20;45:2,5,16,22,
24;47:22;48:3,22,24;
49:16,17,21;74:22;
79:19,19,23,23;80:6,
14,17;81:19;83:14,
22;84:11;85:9,9,19,
22,25

**McLarens (1)**
10:18

**McLaren's (3)**
27:14;37:25;38:2

**mean (29)**
17:8;20:1;21:15;
25:12;26:9;27:1;
29:15;31:22;42:25,
25;43:10;44:17;49:3,
10;54:4,5,9;60:6;
63:17;69:24,25;
70:18,19;71:14;73:9;
74:23;80:3;82:9;
84:24

**means (12)**
20:2;21:18;22:17;
27:10,22;28:16;60:5;
69:13,18,19;72:22;
84:25

**mechanics (1)**
16:8

**meet (3)**
22:11;42:7;45:11

**meeting (1)**
46:23

**memory (2)**
73:22;75:3

**mentioned (1)**
80:21

**mentions (1)**
25:5

**merchandise (2)**
37:25;45:9

**messages (3)**
50:23;51:4;52:1

**messaging (1)**
51:17

**met (1)**
74:22

**meth (1)**
22:24

**methodology (1)**
22:24

**middle (1)**
6:19

**might (1)**
64:20

**minute (1)**
77:14

**module (1)**
56:2

**money (1)**
63:20

**more (8)**
7:12;8:4;30:16;
46:23;60:24;64:1;
68:24;76:8

**most (3)**
18:16;57:4;70:1

**MotorCars (55)**
8:14,23;9:1;10:1,3,
4,11,13,25;11:3,8,11;
12:7,12,16,20;13:2,
13,16;16:11,12,19,22,
22;17:3,22;18:6;
19:21,22;20:2,4;22:9,
21;27:16;28:4;29:8;
32:23;33:1;41:21;
42:13;43:17;45:18;
48:5;50:3;61:22;62:9;
63:25;64:15,17;68:3;
70:15,23;71:6;80:7,
14

**much (2)**
7:1;65:13

**MULLINS (1)**
2:15

**myself (1)**
71:20

**N**

**name (5)**
6:13,14,17;13:19;
32:19

**named (1)**
11:25

**nature (1)**
18:23

**necessarily (1)**
23:8

**need (3)**
7:11;22:25;43:2

**needed (1)**
65:2

**needs (4)**

29:3;30:9;32:5;
62:3

**negligence (2)**
69:16,21

**negligent (1)**
58:7

**negotiate (1)**
26:6

**negotiation (1)**
26:16

**NELSON (1)**
2:15

**network (1)**
27:15

**new (2)**
85:25;86:2

**next (10)**
20:11;27:8;28:14;
31:25;36:17;38:14;
41:7;44:22;62:17;
63:1

**ninth (1)**
38:15

**nitty-gritty (1)**
17:17

**noise (1)**
77:6

**nominated (1)**
38:1

**none (1)**
36:8

**nonwarranty (1)**
81:5

**normal (1)**
45:11

**notice (2)**
45:4,6

**notification (1)**
35:8

**noun (1)**
40:23

**Number (39)**
15:2;17:25;19:16;
43:2,24;44:24;48:12;
49:23;55:2,3,6;56:9,
10;57:7,16;60:3;61:2,
9,12;62:6,14,20,21;
63:5,7,7;65:16;66:8,9,
11;67:19;78:4,9,16,
23;83:24;84:1,13;
85:21

**numerical (1)**
15:6

**O**

**Object (16)**
19:1;21:23;22:12;
23:5;24:22;31:1;35:1,
12;37:15;38:9,24;
41:23;46:3;47:5,8;
84:16

**objection (2)**

Case 1:22-cv-01392-LMM   Document 52-3   Filed 04/05/23   Page 95 of 98

American Family Insurance, et al. v.
McLaren Automotive, et al.

Video Deposition

Brandon Saszi
February 27, 2023

25:8,18
**objections (3)**
25:15;27:4;32:3
**objectives (7)**
42:8,12;43:1;46:20,
21;85:16;86:1
**obligations (2)**
40:2;45:12
**observe (8)**
14:13;15:19,22;
45:17;46:1;58:9;
59:21,24
**obviously (1)**
80:5
**occasions (2)**
74:6,11
**OCGA (1)**
69:11
**off (6)**
42:20;65:11;77:16,
19,22;86:7
**offer (1)**
75:16
**OFFICES (1)**
2:5
**Off-the-record (1)**
77:24
**omission (1)**
58:3;69:15,17,20,
22
**one (21)**
9:2,6;12:11,16;
14:7;18:19;26:5;
28:14;30:24;31:15;
48:15;50:24;54:23;
64:1;68:1,13,16,24;
72:24;77:14;79:22
**ones (3)**
12:10;15:18,18
**online (2)**
20:20;51:19
**only (8)**
12:16;14:7;28:11;
37:25;42:1;63:14;
69:24;80:23
**operating (8)**
20:13,17;21:1;
38:20,22;39:5;40:8;
41:13
**operation (1)**
58:7
**operations (2)**
8:20;83:5
**opinion (3)**
71:15;75:13,16
**opinions (5)**
70:8,10,25,25;
71:15
**order (12)**
15:7;16:24,25;
30:25;32:6;35:10;
38:11;50:23;62:12;
65:16,17;76:11

**ordered (1)**
32:6
**orders (2)**
52:1;56:22
**organizational (1)**
9:5
**organized (1)**
11:3
**origin (1)**
72:9
**out (7)**
18:12;19:5;41:10;
42:8;56:7;77:2;78:10
**Outside (1)**
82:7
**over (4)**
54:1,5;61:20;76:14
**Overbroad (7)**
19:1;23:6;30:1;
31:2;35:2,12;46:4
**overseeing (2)**
8:19;61:23
**oversight (5)**
17:13;76:11,21,22;
77:1
**own (5)**
12:7;13:1,2,14;52:7
**owner (3)**
9:10;71:5,10
**owners (3)**
9:2,6,24
**owns (4)**
11:14;12:16;13:7;
20:2

# P

**P-1 (1)**
18:1
**P-16 (1)**
49:24
**P-17 (1)**
61:4
**P-18 (1)**
78:24
**P-2 (1)**
48:13
**Pacific (1)**
2:16
**Page (23)**
19:16;24:14;26:10;
27:9,19;28:14;36:21,
22,22;38:14,15,15;
41:7,8;42:5;43:9,23,
24;44:8,23,24;49:1;
72:15
**pages (7)**
18:5,10,11,12,13;
36:17;44:22
**paid (2)**
29:2;42:2
**paint (3)**
27:25;28:6,12

**paper (2)**
20:21;65:18
**paperwork (1)**
33:11
**paragraph (1)**
44:11
**parent (2)**
19:24,25
**part (11)**
12:25;14:1,11;16:3;
26:7;32:25;33:3;56:8;
66:18;69:15,20
**particular (2)**
42:1;83:11
**partner (1)**
11:13
**parts (25)**
8:5;9:8,8;22:25;
25:1;27:14;30:9,20,
22;32:5,6,8;34:18,21;
36:6;37:24;38:1,6;
41:12;44:2,7;45:10;
46:21;77:4;82:21
**party (1)**
33:5
**pass (2)**
33:10,11
**passed (1)**
11:24
**Pat (9)**
73:12,16,23;74:5,
12,21;75:3,24;78:19
**pay (1)**
32:9
**payment (1)**
54:20
**pays (2)**
32:8,12
**pending (1)**
7:14
**people (4)**
59:17;85:2,4,8
**per (4)**
42:13;43:3,5;59:11
**perfectly (1)**
22:19
**perform (2)**
30:8;38:18
**performance (1)**
76:7
**performed (11)**
27:23;30:3;36:6;
37:13;41:21;45:9,18;
76:4,12,21;77:10
**performing (1)**
45:12
**performs (2)**
22:22;28:4
**period (1)**
54:2
**permit (1)**
45:2
**person (3)**

21:16;27:10;61:22
**personal (2)**
52:15;74:19
**personally (2)**
14:13;15:19
**personnel (1)**
45:11
**photographs (9)**
14:19,21,24;15:3,
10,13,16,17;56:24
**physical (1)**
38:23;50:2,17
**pictures (1)**
79:6
**pieces (1)**
65:17
**pipeline (1)**
46:20
**place (1)**
28:22
**placement (3)**
66:16,20,24
**Plaintiff (8)**
2:2;6:10;69:9,18,
23;72:20,20;84:9
**plan (1)**
42:9
**please (14)**
6:4,15;7:2;15:3;
22:20;44:12;49:23;
58:2;60:3;65:22;
77:21;78:4,9,23
**pled (1)**
69:11
**pm (5)**
6:2;77:22,25;86:7,9
**point (3)**
15:15;34:17;61:21
**policies (13)**
25:6,7,13,25;26:1,3,
20,22;27:2;35:19;
38:21;53:19,23
**policy (8)**
27:5;28:15,16,22;
29:2,8;41:11,12
**porters (1)**
9:9
**position (3)**
48:8;71:6,10
**potential (3)**
58:10;59:22,24
**precisely (1)**
29:13
**prejudice (1)**
45:1
**premises (1)**
45:7
**prepare (1)**
7:17
**primary (3)**
8:17;12:10;17:12
**print (1)**
18:12

**printed (5)**
51:8,10,11,13,21
**prior (1)**
45:3
**privy (2)**
59:3;71:2
**probably (4)**
26:8;60:8,14;73:15
**problem (1)**
59:19
**procedure (1)**
27:5
**procedures (12)**
25:6,7,13,25;26:2,3,
21,22;27:2;38:21;
53:20,23
**process (1)**
29:17
**produce (2)**
20:24;21:3
**produced (6)**
20:25;21:2;28:17;
39:11;56:15,20
**Producing (2)**
55:20;57:6
**production (3)**
50:5;56:12;57:18
**products (4)**
24:15,16;37:8;
47:15
**promote (1)**
37:7
**proper (1)**
40:23
**properly (1)**
41:10
**property (1)**
23:4
**provide (3)**
27:12;37:8;47:21
**providers (1)**
38:2
**provides (3)**
47:22;58:22;62:13
**proximate (2)**
69:17,22
**pull (1)**
65:16
**purchase (1)**
37:24
**purchased (2)**
38:7,8
**purpose (3)**
46:7,17;70:13
**pursuant (1)**
69:11
**put (7)**
62:17;63:1;76:17,
19,20;77:4;82:21

# Q

**quality (2)**

Case 1:22-cv-01392-LMM   Document 52-3   Filed 04/05/23   Page 96 of 98

American Family Insurance, et al. v.
McLaren Automotive, et al.

Video Deposition

Brandon Saszi
February 27, 2023

76:6;77:10

**quick (1)**
  74:24

## R

**rat (3)**
  14:14;15:20;16:5
**read (5)**
  24:18;25:21;41:18;
  43:10;44:12
**really (4)**
  23:12,13;65:10;
  82:25
**reason (1)**
  23:1
**reasonable (1)**
  45:3
**reasonably (1)**
  45:5
**recall (31)**
  15:14;26:10;27:25;
  29:17,21;30:2,7,8,10,
  11,17,18;31:17;32:2,
  14,17;33:20;36:10,13,
  15;42:1;52:4;75:7,8,
  23;78:18,22;80:24;
  81:3,13,19
**recalls (10)**
  31:8,11;34:1,2,6,7,
  9,12,16,22
**received (1)**
  56:3
**recommendations (1)**
  8:8
**record (7)**
  6:3,15;77:17,20,23;
  78:1;86:8
**recorded (1)**
  76:2
**records (1)**
  50:12
**redirect (1)**
  43:21
**refer (2)**
  61:1;70:4
**referred (3)**
  24:16;27:2,6
**referring (3)**
  26:3,23;66:15
**reimbursed (4)**
  32:10;35:6;80:24;
  81:4
**reimbursement (3)**
  33:12,20;43:12
**related (2)**
  11:11;50:4
**relation (1)**
  27:12
**relationship (7)**
  16:10,14,16;19:6,
  10;40:1;80:6
**relationships (1)**

8:20
**relatively (1)**
  83:23
**relief (2)**
  63:10;67:24
**rely (1)**
  77:4
**remember (29)**
  11:1;50:22;52:2;
  53:1,3;55:14,15;
  56:17,21,22,24;57:3,
  5;68:17,19;73:15,17,
  25;74:4,6,10,14,17,
  25;75:10,11,15,19;
  85:15
**rents (1)**
  13:10
**renumerated (2)**
  41:9,20
**repair (26)**
  13:18;16:24,25;
  21:11,17;27:12,21,22,
  24;28:4;37:9;38:17,
  19;41:10;45:8;46:2;
  49:14;50:23;52:1;
  77:8,9,12;80:22;81:8,
  8,12
**repaired (5)**
  66:6;68:12,22,25;
  81:7
**repairing (1)**
  67:1
**repairs (5)**
  21:19;27:25;28:6,
  12;38:7
**rephrase (2)**
  7:4;22:20
**replace (1)**
  49:14
**replaced (3)**
  66:6,21;69:1
**report (2)**
  78:19;79:9
**reporter (2)**
  6:4;7:8
**represent (2)**
  18:4;62:7
**representative (4)**
  27:10,15,17;83:15
**representatives (2)**
  45:3;83:21
**request (1)**
  7:13
**requested (3)**
  43:18;51:15;57:19
**require (1)**
  48:2
**required (1)**
  45:7
**respect (1)**
  59:2
**response (2)**
  56:12;62:11

**responses (1)**
  57:8
**responsibilities (1)**
  8:17
**responsibility (2)**
  17:12;42:18
**responsible (4)**
  17:21;70:23;71:7,
  13
**result (2)**
  43:18;49:13
**resulting (1)**
  14:14
**right (110)**
  7:5,9,15;8:10,22,
  25;9:14;10:8;11:2;
  12:1,15;14:9;17:24;
  18:22;19:15,20;
  20:11;21:6;26:19;
  27:8,19;28:11,14;
  29:16;31:10,19;
  32:12,22;33:17,19,23;
  34:17,24;36:5,17,24;
  37:3,7;38:14;39:8;
  40:5;41:4;42:4;43:6,
  8,21;44:2,8,22;46:25;
  48:11;49:7;51:24;
  53:25;54:14,21;
  55:21,24;56:1,7,15;
  57:7,12,14;58:21;
  60:2,13,24;61:8;62:6,
  10,21,22,24;63:23;
  64:9,10,12;65:15,24;
  66:2,4,7,15;67:4,20;
  68:5,7,9,9,17;69:7;
  72:14;73:5;75:16,21;
  78:13,14;80:19,19,25;
  81:2,5,18;82:2,8,11;
  83:22;84:5,23
**ring (1)**
  9:16
**Road (2)**
  11:9,12
**Robles (5)**
  13:21;50:25;51:18;
  52:14,18
**Rodent (18)**
  14:15,16;57:1;
  63:16,24;64:8,10,14,
  20;66:5,20;67:5;68:2,
  22;69:1;81:7,11;82:4
**role (1)**
  8:14
**Rolls-Royce (2)**
  10:24;12:24
**ROs (1)**
  50:15
**Roswell (1)**
  11:9
**rule (1)**
  54:22
**RYAN (3)**
  2:13;20:24;39:11

ryancosgrove@nelsonmullinscom (1)
  2:20

## S

**sale (1)**
  41:13
**sales (13)**
  9:7;12:21;18:7;
  38:20,22;40:8;42:8,
  12;43:1;46:20;85:16,
  24;86:3
**salespeople (1)**
  9:9
**same (10)**
  15:3;19:22;25:8,15;
  27:4;32:3;36:19,20;
  61:13,19
**Sandy (1)**
  11:9
**SASZI (2)**
  6:6,16
**S-A-S-Z-I (1)**
  6:18
**save (2)**
  45:4;63:20
**saw (5)**
  15:13,18;16:2;55:7,
  10
**saying (4)**
  7:9;25:22;33:10;
  66:17
**schedule (1)**
  40:20
**schedules (1)**
  25:16
**scheduling (1)**
  51:6
**scope (1)**
  28:3
**se (1)**
  59:11
**search (3)**
  50:5;51:25;55:21
**second (3)**
  24:18;69:7,8
**Section (5)**
  20:12;24:14;25:5;
  27:3;69:11
**seeking (1)**
  69:10
**seem (1)**
  63:17
**seems (1)**
  58:17
**select (4)**
  18:5,10,11,13
**sell (10)**
  19:11;21:19,20;
  25:4;27:13;37:7;43:2,
  5;65:11;85:22
**send (1)**
  50:10

**sense (2)**
  60:6,8,10;62:2
**sensor (2)**
  77:6,6
**sentence (1)**
  24:25
**separate (3)**
  40:7,19;80:14
**Series (3)**
  48:22,24;49:16
**service (21)**
  9:8;12:21;14:10,10;
  16:13,15;18:7;19:11;
  20:18;27:10,15,17,23;
  36:6;38:19;41:10;
  45:8;48:21;51:5,6;
  60:21
**services (9)**
  21:11;27:12,21,23;
  28:4;32:21;33:9;37:9;
  38:17
**servicing (3)**
  14:3;27:24;35:25
**set (4)**
  40:4;42:8,16;69:15
**several (4)**
  15:9;26:14;54:2,3
**shaded (3)**
  19:18,19;20:12
**shaken (1)**
  77:2
**shall (6)**
  37:23;38:18;41:9;
  45:2,6;63:11
**shareholders (1)**
  8:21
**sheet (1)**
  61:15
**shop (3)**
  14:12;17:19,19
**short (1)**
  54:2
**show (2)**
  17:24;70:14
**showed (1)**
  15:16
**shows (4)**
  59:23;72:17;73:6;
  77:5
**side (5)**
  24:12;62:17,18;
  65:20;71:3
**sign (1)**
  18:20
**signed (1)**
  26:8
**signing (1)**
  26:7
**signs (3)**
  58:10;59:22,24
**similar (1)**
  80:9
**simplest (1)**

American Family Insurance, et al. v.
McLaren Automotive, et al.

Video Deposition

Brandon Saszi
February 27, 2023

60:15
**simply (1)**
20:4
**single (1)**
17:18
**SIS (2)**
24:2,3
**situation (1)**
43:13
**sixteenth (1)**
43:8
**small (1)**
83:23
**so-called (1)**
82:8
**software (1)**
33:16
**sold (1)**
45:10
**somebody (3)**
15:15;30:24;62:3
**somehow (1)**
51:9
**someone (1)**
83:9
**Sorry (16)**
10:21;13:24;15:6;
22:2,3,5;33:16;36:4;
49:3;64:1;68:24;73:7;
74:4,9;75:1;79:1
**South (1)**
2:17
**spare (6)**
27:13;37:24;38:1;
41:12;44:2;45:10
**speak (3)**
7:25;29:9;75:21
**speaking (1)**
74:12
**speaks (3)**
24:23;25:9;38:25
**special (1)**
69:10
**specialized (2)**
16:7;48:3
**specific (10)**
8:13;20:21;30:16;
32:22;60:25;65:9;
70:2;74:11;75:3;76:8
**specifically (10)**
45:25;57:5;58:20;
59:4;61:2;65:6;69:11;
74:7;75:21;77:11
**specifics (1)**
8:11
**speculation (1)**
72:11
**speculative (1)**
25:19
**spell (1)**
6:17
**spoke (5)**
74:6,10;75:2,4,24

**spoken (3)**
58:25;59:15;73:12
**Springs (1)**
11:9
**stack (1)**
15:5
**stand (1)**
6:21
**standard (1)**
38:23
**standards (9)**
20:13,17;21:2;
22:11;38:20;39:5,23;
40:8;41:14
**start (2)**
48:7;72:2
**started (2)**
48:8;71:24
**starting (1)**
43:9
**starts (3)**
42:5;44:9,24
**state (5)**
6:14;11:5;60:3;
63:8;67:22
**statement (2)**
58:23;76:3
**States (1)**
79:22
**step (1)**
31:25
**steps (1)**
35:10
**still (3)**
37:21;43:8;83:2
**stop (1)**
7:2
**storage (1)**
50:16
**stored (1)**
45:10
**Street (1)**
2:6
**structure (3)**
8:23;9:1;84:19
**stuff (2)**
14:14;56:16
**subject (7)**
13:18;14:3;32:1;
53:22;58:1;75:8,11
**submit (5)**
29:5;35:7,22,23;
36:2
**sudden (1)**
72:19
**sued (1)**
44:18
**suggestions (1)**
8:7
**Suite (1)**
2:16
**sun (1)**
82:10

**Super (2)**
48:21,24
**supervision (2)**
76:12,23
**supplied (2)**
30:21;44:7
**supplies (2)**
22:25;30:9
**supply (1)**
30:22
**support (5)**
58:25;63:6,15;69:5,
8
**supports (1)**
60:4
**supposed (1)**
42:13
**sure (19)**
7:7,14;10:8;13:20;
15:2;19:17;24:23;
26:11;32:4;40:19;
61:16;64:3,7;65:24;
76:9,24,25;78:5;
84:13
**suspects (1)**
45:5
**swear (1)**
6:4
**sworn (1)**
6:7
**system (3)**
17:9;51:6,17

---

**T**

**talk (9)**
8:2,10;19:15;34:24;
63:21,23;67:4;71:17;
73:23
**talked (8)**
7:19,20;55:22;
60:21;73:16,18,18;
74:5
**talking (4)**
25:12;33:25;34:2;
80:22
**tank (2)**
24:7;72:3
**tech (3)**
7:19,24;14:22
**technical (6)**
8:5;24:10,12;56:2,
3;71:3
**technician (2)**
60:22;76:10
**technicians (5)**
9:9;47:15,19;48:2;
76:7
**tenth (1)**
41:8
**term (4)**
24:23;39:14;40:11,
23

**terms (10)**
23:25;25:18;26:19;
30:6;39:18;56:8;
59:18;60:15;72:19;
80:5
**test (4)**
76:13;77:2,5,7
**testified (1)**
6:9
**testify (1)**
6:7
**testifying (1)**
85:15
**texting (1)**
51:5
**texts (1)**
56:22
**therefore (2)**
63:10;67:24
**third (2)**
33:5;69:14
**thorough (1)**
67:17
**though (3)**
80:13;82:2,8
**thought (2)**
22:4;67:5
**thoughts (1)**
60:22
**three (4)**
14:5;49:8;54:23;
65:17
**timeline (1)**
59:7
**times (6)**
17:11,19;34:4;54:2,
3,21
**today (3)**
7:1,22;8:3
**Today's (2)**
6:1;7:18
**Together (5)**
25:16;50:10;76:17,
20;77:5
**told (1)**
64:24
**took (1)**
14:21
**top (1)**
42:20
**Torrance (1)**
2:18
**touch (1)**
71:21
**touched (1)**
14:8
**town (1)**
53:10
**track (1)**
82:19
**training (5)**
16:8;48:3;56:2,3;
72:6

**transcript (5)**
18:2;48:14;49:25;
61:5;78:25
**transport (2)**
49:21;58:7
**truth (3)**
6:8,8,8
**trying (2)**
29:9,13
**turned (1)**
65:9
**Turning (1)**
48:11
**tutorial (1)**
24:6
**twenty-eighth (1)**
44:23
**twenty-fifth (1)**
43:23
**two (11)**
9:2,6,7;12:10;
16:16;30:14;53:4,5;
54:23;65:20;80:2
**type (5)**
23:3;35:7;76:11,21;
83:15
**types (1)**
27:1
**Typically (1)**
25:12

---

**U**

**UK (1)**
79:24
**under (9)**
11:3;12:11;35:17;
41:11;45:12;79:5;
82:10;85:18,18
**understandable (1)**
22:19
**Understood (1)**
10:10
**United (1)**
79:22
**Unless (1)**
25:21
**unpack (1)**
72:23
**unrelated (1)**
74:3
**unusual (1)**
81:2
**up (2)**
59:8;70:1
**upon (1)**
45:3
**Use (3)**
42:7;51:6;54:17
**used (4)**
30:10;51:18;85:24;
86:1

Case 1:22-cv-01392-LMM   Document 52-3   Filed 04/05/23   Page 98 of 98
American Family Insurance, et al. v.
McLaren Automotive, et al.
Video Deposition
Brandon Saszi
February 27, 2023

## V

**Vague (11)**
21:23;22:12;23:5;
29:23;30:1;31:21;
35:1;37:15;46:3,9;
47:8
**vaguely (1)**
75:8
**validly (1)**
41:10
**various (1)**
62:12
**vehicle (17)**
13:17,19;14:4,14;
15:20;23:3,8;27:24;
28:15,22;29:7,18;
41:11;58:8;80:22;
81:24;82:11
**vehicles (10)**
12:25;21:13;27:13,
14,23;28:5,18;37:8,
24;45:9
**Vermont (1)**
2:17
**Vernon (4)**
9:13,23;11:15;26:8
**VIDEOGRAPHER (5)**
6:1;77:19,22,25;
86:7
**VIN (1)**
32:4
**violate (1)**
54:22
**virtual (1)**
24:6
**visit (2)**
45:7;46:16
**visited (1)**
45:22

## W

**warning (3)**
58:10;59:22,24
**warrant (1)**
28:16
**warranty (41)**
21:18;27:24;28:15,
22;29:3,5,7;30:8,11;
32:16,17,19,21;33:8,
8,11;34:3,13,24;35:8,
10,14,17,18,22,25;
36:7,9;41:11,12;44:3,
7;48:21;49:7;81:3,8,
12,19;82:6,18,23
**washer (1)**
48:9
**way (3)**
22:10;23:22;57:25
**what's (6)**
25:20;31:25;33:15;

60:10;65:21;82:18
**whatsoever (1)**
13:17
**whole (2)**
6:8;9:4
**who's (1)**
61:22
**wires (3)**
15:23,25;16:2
**wiring (1)**
16:1
**within (4)**
27:14;40:11;53:4,5
**Without (2)**
45:1;82:19
**witness (10)**
6:5;19:4;25:19;
40:3,16;77:15,18;
79:15;83:2;86:6
**word (2)**
26:10;53:19
**words (1)**
41:16
**work (52)**
17:3;21:21,22;
22:10,22;23:2;28:9;
29:3,18;30:3,7,8,11,
17,18;31:17;32:14;
33:21;34:13,18,24,25;
35:3,8,11,14;36:6,7,9,
10,13,15,15;37:13;
41:21;45:17;46:2;
47:2,7,19;48:2;52:15;
56:22;63:25;65:15,
17;76:3,11,12,21;
80:10,24
**working (4)**
47:15;52:19;74:16;
76:10
**works (3)**
23:13;27:25;29:17
**Wow (1)**
48:10
**written (1)**
16:21

## Y

**year (5)**
42:9,14;43:3,5;53:2
**years (4)**
48:6;49:8;53:4,5

## 0

**02110 (1)**
2:7
**0286 (1)**
43:25
**0289 (1)**
44:25
**0360 (1)**
49:1

## 1

**1 (7)**
17:25;18:4;19:16;
41:8;43:8,22;44:8
**10 (1)**
84:15
**101 (1)**
2:6
**11 (2)**
15:3,9
**15 (1)**
84:15
**15.6 (1)**
45:2
**1575 (1)**
11:11
**16 (13)**
49:23;55:3,3,6;
56:9,10;62:14,20,23;
65:18,25;66:1,2
**17 (14)**
61:2,9,12;62:6;
63:1,7,7;65:18,25,25;
66:1,2;67:19;72:15
**18 (4)**
78:23;79:1,3,4
**18.2.6 (1)**
44:9
**19191 (1)**
2:17

## 2

**2 (8)**
19:16;24:14;48:12;
57:8;66:8,9,11;72:15
**2:27 (1)**
6:2
**20 (3)**
78:4,7,10
**2020 (2)**
42:21,22
**2021 (2)**
42:19;58:1
**2023 (1)**
6:2
**21.8 (1)**
44:24
**22 (1)**
48:6
**24th (1)**
58:1
**26 (1)**
44:8
**27th (1)**
6:2

## 3

**3 (5)**
49:16;57:14,15,16,

20
**3:40 (2)**
77:22,25
**3:48 (2)**
86:7,9
**300 (1)**
18:12
**359 (2)**
49:3,5

## 4

**4 (1)**
27:20
**4.2 (1)**
37:23
**40 (1)**
43:2
**424-221-7404 (1)**
2:19

## 5

**5 (7)**
28:14;49:3,5;57:22,
24;78:9,16
**5,000 (1)**
54:16

## 6

**6 (4)**
60:3,20;62:21;63:5
**617-539-8674 (1)**
2:8

## 7

**7 (5)**
65:16,18,22;66:4,
10
**764 (1)**
13:18
**765 (3)**
14:3;49:16,21
**7865 (1)**
11:9

## 8

**8th (1)**
2:6

## 9

**9.27 (1)**
42:5
**9.31 (1)**
43:9
**900 (1)**
2:16
**90502 (1)**
2:18

**9-11-9G (1)**
69:12